TURNAGE v. RITCHIE GROCER COMPANY.

4-6858                                      165 S. W. 2d 604

Opinion delivered November 9, 1942.

*Claude E. Love* and *W. R. McHaney,* for appellant.

*Mahony & Yocum* and *A. L. Brumbelow,* for appellee.

GRIFFIN SMITH, C. J. The issue is whether W. H. Turnage, A. D. Blakely, and Carl Lewis were partners in a grocery business; or, in the alternative, if it should be held that as between themselves there was no intention to create the relationship, is Turnage, because of conduct, estopped to deny his connection.

Blakely and Alvin Pitts, with $2,000 supplied by Turnage, went from Smackover, Arkansas, to Arp, Texas, and opened a place of business in February, 1938. Contract between the parties was in triplicate, but prior to trial all were lost. Evidence is abundant that if Turnage had rested his rights on the agreement and had refrained from activities relating to the business, the liability now asserted against him could not be sustained.

Blakely communicated to Turnage his displeasure at Pitts' attitude. This occurred approximately two

months after the store was opened. Responding to Blakely's complaints, Turnage wrote the letter shown below.[1] Blakely says that when Pitts went "haywire" by drawing from $200 to $250 monthly for personal use, he (Blakely) proposed to purchase from Pitts, or to sell. Since Pitts did not have money with which to acquire Blakely's interest, and was not willing to accept the offer made by letter, Turnage and his lawyer went to Arp and concluded an arrangement whereby for $250 paid by Turnage, Pitts "bargained, sold, and conveyed whatever interest he had" to Lewis, whom Blakely had recommended to Turnage as one with whom he would like to be associated. Evidence of the transaction, as quoted in the preceding sentence, was indorsed by Pitts on the back of two of the originals of the contract made before business was begun in Texas.

There is testimony of mutual intentions to have the new agreement formally written and signed, but this was not done.

Turnage contends that as between himself and Blakely and Pitts, the status was that of debtor and creditor: that is, he made a personal loan with the understanding interest at ten percent per annum would be paid and a third of the profits would be applied toward liquidation of the obligation.

The enterprise was not profitable. Two months after Lewis became a partner with Blakely they moved the stock of goods to Smackover. Turnage says this was without his knowledge. However, he rented a building for accommodation of the parties and interested himself in other ways.

On petition of Ritchie Grocer Company Lewis and Blakely were superseded when on May 1, 1939, Homer T. Rogers was appointed receiver. Five creditors filed claims which, exclusive of interest, amounted to $1,509.59.

---

[1] The communication was addressed to Alvin M. Pitts:—"This is to certify that from this day on, A. D. Blakely is manager, buyer, and boss. He is to have full charge. I will give you $150 for your so-called interest—not one cent more—to be paid to you by A. D. Blakely who will draw a draft on me for that amount. However, if you wish, you may stay and work under Blakely for the sum of $15 per week only." The letter is dated April 28, 1938.

Turnage listed his advances, contending the item was an allowable debt. The receiver concluded Turnage was a partner rather than a creditor, and disallowed. Chancery sustained.

Before one can be held liable for partnership debts, the relationship must have been formed by express agreement or conduct from which agreement is implied or the party sought to be charged must have created an estoppel.[2] "To determine whether a given agreement amounts to a partnership between themselves," said Chief Justice Hill,[3] "is always a question of intention. But a different test prevails where the rights of third parties are concerned. It was formerly held that participation in profits was conclusive evidence in actions by creditors. This rule has been modified so that a participation in profits is not conclusive, but 'it is a cogent test for trying the question,' and 'is conclusive unless there are some circumstances altering the nature of the contract'."

In the instant case a preponderance of the evidence is that the contract was that when Turnage had been repaid from a third of the profits, his connection terminated, provided that in the meantime interest had been met. Interest was payable from profits. There is the statement in appellant's brief that Blakely and Pitts (and, presumably, Blakely and Lewis when Lewis was substituted for Pitts) were to pay ". . . ten percent on the money loaned them, and if profits were more than ten percent, one-third of [such profits] would be applied toward liquidation of the debt: that is, if there were an excess over the interest."

There is evidence that notes were given Turnage by Blakely and Pitts; that the accord between Blakely and Lewis was consummated before a definite agreement was reached with Pitts, and the Blakely-Pitts notes "were cancelled and destroyed." It is also contended that a mortgage covering fixtures was executed to secure the notes.

---

[2] *Haycock* v. *Williams*, 54 Ark. 384, 16 S. W. 3; *Mehaffy* v. *Wilson*, 138 Ark. 281, 211 S. W. 148.

[3] *Buford* v. *Lewis*, 87 Ark. 412, 112 S. W. 963.

Turnage involved himself when he departed from the contract. Under its terms he did not have the right of interference—foreclosure, etc.—until a year from the time his advance of $2,000 was made. Yet within two months he designated Blakely as "buyer and boss," stating in the letter that Blakely should have "full charge." It is conceded by Turnage that fixtures were purchased in his name. Blakely and Pitts made a down payment from the original fund advanced by Turnage, and Turnage signed a note evidencing the balance agreed upon.

J. L. Daniels, Ritchie Grocer Company credit manager, went to Smackover to investigate the business. Daniels says he made the usual inquiries, then went to Turnage, who told him to do whatever he desired. In the course of conversations regarding Smackover Grocery Company—the trade name adopted by Blakely and Lewis—Turnage said he owned "everything over there." Turnage did not say he was a partner. Neither did he request that additional credit be extended, or guarantee payment of accounts which subsequently accrued. Pitts testified he sold his interest to Turnage. Blakely also testified Turnage bought Pitts' interest.

When the business opened at Smackover, Turnage made the necessary deposit for electric light connections. Current was billed to him. The lease on the building occupied in Smackover involved more space than that required for the grocery business. Although Blakely joined Turnage in signing the lease, rentals were paid to the owner who lived in Ohio, and not to Turnage.

There is testimony that Turnage counseled with Blakely and Lewis, advising them in respect of customer credits.

The court found that, in respect of creditors, the relationship between Blakely, Lewis and Turnage "was that of partners," and that "prior to April 26, 1939, they operated the Smackover Grocery Company."

The holding was correct. Affirmed.