WYMER *v.* DEDMAN.

350 S. W. 2d 169

Opinion delivered September 25, 1961.

[Rehearing denied November 6, 1961.]

*C. M. Erwin* and *Marvin D. Thaxton,* for appellant.

*Pickens, Pickens & Boyce,* for appellee.

CARLETON HARRIS, Chief Justice. On February 18, 1958, appellee, Ray Dedman, operating an automobile belonging to his wife, Myrtle Dedman, collided with the rear of an unlighted trailer, loaded with cotton seed hulls, which was being pulled by a tractor driven by Ernest Brooks. Brooks was a farm laborer employed by Joe Wymer. The Dedmans instituted suit against Wymer, appellee Myrtle Dedman seeking judgment for damage to her automobile in the amount of $825.37, and appellee Ray Dedman, seeking damages for injuries sustained in the amount of $5,000. Subsequently, the complaint was amended to include Kaneaster Hodges as a defendant, appellees alleging that Wymer and Hodges were partners in the raising and marketing of cattle; that Brooks was an employee of the partnership, and that at the time of the collision, Brooks was performing his duties and acting on the instructions of appellants herein in that he was specifically hauling cattle feed from the Southern Cotton Oil Mill for appellants. Separate answers were filed by Wymer and Hodges, alleging, *inter alia,* that Ray Dedman was operating the automobile in a negligent and careless manner; that he was operating the car as an agent for his wife, Myrtle Dedman, and in pursuance of a mission for both himself and wife; that the two were engaged in a joint venture at the time of the collision. As a third party complaint

against Dedman, appellants individually prayed that if they "be held liable in any amount to the plaintiff Myrtle Dedman for the reason that the negligence of the plaintiff Ray Dedman is not imputable to her," then they asked "to recover over the full amount of such judgment against the plaintiff Ray Dedman" because of his negligence in excess of that of the appellants. At the conclusion of the evidence, the court submitted the case to the jury on five special interrogatories. In response to Interrogatory No. 1, the jury found that Joe Wymer and Kaneaster Hodges were engaged in a partnership cattle business. In response to Interrogatory No. 2, relating to the percentage of total negligence which was the proximate cause of the collision, the jury found that the partnership of Wymer and Hodges should be charged with 55%, and Ray Dedman, 45%. Myrtle Dedman's damage (to automobile) was fixed at $825, and Ray Dedman was awarded $662 for personal injuries. In accordance therewith, judgment was entered against appellants in favor of Mrs. Dedman in the amount of $825, and judgment entered for Ray Dedman in the amount of $364.10, the amount of his damages, reduced by the percentage of his negligence. From such judgment, Wymer and Hodges bring this appeal. For reversal, appellants rely upon four points, which we list in the order for discussion, rather than in the order listed by appellants.

## I.

The written agreement of Wymer and Hodges constituted a relation of landlord and tenant.

## II.

The court should have submitted to the jury an issue as to joint enterprise of Ray Dedman and Myrtle Dedman.

## III.

The court mistakenly stated in the premise to Interrogatory No. 4 that the jury should not measure Myrtle

Dedman's damages if both parties were found 50 per cent negligent.

## IV.

The judgment should have been entered, if at all, against Joe Wymer, Kaneaster Hodges and Ray Dedman.

## I.

We cannot agree that, as a matter of law, the written agreement between Wymer and Hodges created the status only of landlord and tenant, though it terms appellant Hodges as lessor and appellant Wymer as lessee. That contention may be correct as far as the farm acreage and crops are concerned, but we are here only interested in that portion of the agreement relating to the raising of cattle. Such portion reads as follows:

"The parties agree that they will undertake to develop pasture lands upon the farm in rotation with the rice crops and soybean crops and that they will purchase a suitable herd of cattle to be kept and maintained upon the pastures and the farm. *It is agreed that each party will purchase and pay for one-half of the cattle and that each party will own an undivided one-half of the cattle and an undivided one-half of all the increase therefrom.*[1a] The lessor shall build suitable fences. The lessee shall purchase pasture seeds, prepare the ground and sow it. The lessee shall undertake to grow on the farm, put up, cure or save all of the supplemental feed needed in addition to the pastures. The lessee shall tend, water, feed and otherwise care for said cattle, which shall include routine repair and maintenance of the fences. It is the understanding of the parties that the lessor shall purchase one-half the cattle, furnish the land and build the fences and that the lessee shall do and furnish everything needed in addition thereto for the herd of cattle. *In the event that, at any time, the lessee, through causes beyond his control, cannot raise or keep sufficient feed for the cattle then the parties shall agree upon the purchase of the necessary supplemental feed*

[1a] Emphasis supplied.

*and each party shall pay one-half the cost thereof,*[1b] which shall apply to the initial purchases of feedstuff prior to the 1956 growing and harvest season.''

It is asserted that in the cattle enterprise, the two men had wholly different expenses and duties, and that no right of control was reserved to Hodges. Mr. Hodges testified that Mr. Brooks did not work for him, and that he did not send Brooks after cattle feed. He stated that he and Wymer owned the entire herd, but that there was no agreement on profits or losses.

''The first cattle were bought some two years before this and Mr. Vasso had a half interest in the herd of cattle. I bought out Mr. Vasso, and I sold Mr. Wymer a half interest in the herd of cattle at the time of the lease agreement. As I remember, the First National Bank had a mortgage, and over and above that, Mr. Wymer gave me a note. I took a title retaining note for half of the cattle owed to him. Now, that gets us started. If any were sold, the money was applied at the bank, and no money was applied on the side note owed to me, and I held that until May or June, 1958; the herd of cattle had grown to the point where we were able to borrow enough at the bank and Mr. Wymer paid me off the side note. We sold the cattle in February, 1959. When we sold, we paid the bank and we each took half of the balance. What part of that was profit and what part capital, I am not able to say.''

According to Hodges, at one time, three cows died, and the two men shared the loss equally.

Wymer testified that he sent Brooks into town for feed for the cattle; that he had a one-half interest in same; that when it was necessary to buy additional feed for the cattle, the cost was split ''50-50'' at the end of a year; when the proceeds from sales exceeded the debt, such proceeds were divided ''50-50.''

Under our statute, cited as Uniform Partnership Act, a partnership is defined as ''an association of two [2] or more persons to carry on as co-owners a business

---

[1b] Emphasis supplied.

for profit." Blacks Law Dictionary, Fourth Edition, 1957, defines a partnership as "a voluntary contract between two or more competent persons to place their money, effects, labor, and skill, *or some or all of them,*[2] in lawful commerce or business, with the understanding that there shall be a proportional sharing of the profits and losses between them."

There are, of course, many types of partnership agreement, containing multiple provisions, and so diverse as to make difficult any attempt at a definition that will cover all cases. However, the definitions heretofore cited are somewhat standard, and rather concisely cover the relationship as it is generally understood. In the litigation before us, there was evidence that the cattle were jointly owned by appellants; that proceeds from the sale of the cattle, and profits, if any, were shared equally; that losses were shared equally, and that costs of maintaining the herd (when it became necessary to purchase supplemental feed) were likewise equally borne. This evidence was pertinent to the issue of whether appellants had associated themselves together in the business of raising cattle for profit. The fact that their obligations, or duties, under the agreement were not identical, is of no moment. See 68 C. J. S., Partnerships, Section 9, p. 413. Likewise, the fact that appellant Hodges did not send Brooks after the cattle feed, does not, in itself, constitute a defense, for, if the parties were partners, the one is liable for the acts of the other, if committed in the course of business. In addition, irrespective of the actual relationship between the two, there is the matter of legal liability where the rights of third parties are concerned. In *Turnage* v. *Ritchie Grocer Company,* 204 Ark. 935, 165 S. W. 2d 604, this Court, quoting from an earlier case,[3] said:

"To determine whether a given agreement amounts to a partnership between themselves," said Chief Justice HILL, "is always a question of intention. But a different test prevails where the rights of third parties

[2] Emphasis supplied.
[3] *Buford* v. *Lewis,* 87 Ark. 412, 112 S. W. 963.

are concerned. It was formerly held that participation in profits was conclusive evidence in actions by creditors. This rule has been modified so that a participation in profits is not conclusive, but 'it is a cogent test for trying the question,' and 'is conclusive unless there are some circumstances altering the nature of the contract'."

We hold there was substantial evidence to support the jury's finding that Wymer and Hodges were partners in the enterprise of raising cattle for profit.

## II.

Three requested instructions, submitting the issue of whether appellees were engaged in a joint venture,[4] were refused by the court. We cannot agree with appellants that this issue should properly have been submitted to the jury. The proof reflected that the automobile, involved in the wreck, was owned by Mrs. Dedman, but at the time of the collision, was being operated by Mr. Dedman, who used the car to travel to and from work. On that occasion, Dedman was also transporting to work a man named Porter, and had been transporting the latter since August, 1955. For this service, Porter paid Mrs. Dedman the sum of $5 per week. In 4 *Blashfield* Chapter 65, § 2373, p. 493-95, we find:

"An essential, and perhaps the central, element which must be shown in order to establish a joint enterprise is the existence of joint control over the management and operation of the vehicle and the course and conduct of the trip. There must, as said in another connection, in order that two persons riding in an automobile, one of them driving, may be deemed engaged in a joint enterprise for the purpose of imputing the negligence of the driver to the other, exist concurrently two fundamental and primary requisites, to-wit, a community of interest in the object and purpose of the undertaking in which the automobile is being driven and an

---

[4] According to *Prosser on Torts*, 2nd Edition, paragraph 65, p. 363, in a discussion of joint enterprise, "where the enterprise is for some commercial or business purpose, and particularly where the parties have agreed to share profits and losses, it usually is called a joint adventure."

equal right to direct and govern the movements and conduct of each other in respect thereto.''

Further, on pages 500 and 501:

''It is commonly a question of fact, for the jury to say, whether a joint enterprise existed between the driver and another occupant of an automobile, except where the evidence as to the existence of such a relation is insufficient to go to the jury.

''The doctrine of joint adventure, in connection with the operation of motor vehicles, should be restricted to those cases where the common right to control its operation and the correlative common responsibility for negligence in its operation either are clearly apparent from the agreement of the parties or result as a logical and necessary conclusion from the facts as found.''

Whether an instruction, placing in issue the question of whether Dedman was acting as agent for his wife, would have been proper, is not before us, for no such instruction was requested. Appellants call attention to the case of *Callaway* v. *Cherry*, 229 Ark. 297, 314 S. W. 2d 505, wherein we said:

''In seeking to uphold the judgment counsel for Mrs. Cherry rely upon the language in many of our decisions, including the *Lockhart* case, to the effect that in a joint enterprise the participants must have an equal right to direct and govern the movements and conduct of each other. It is therefore contended that a joint enterprise could not have existed between Mrs. Cherry and her son, since Neil had no power to control his mother's conduct. Even so, we regard the distinction as one of nomenclature rather than of substance. It might well have been more accurate for the plaintiff to assert an agency relationship rather than a joint venture; but the vital issue presented by the proof was whether Neil's negligence might be imputed to his mother, and we are not persuaded that the imperfect terminology misled the trial court or opposing counsel.''

That case is of no aid to appellants, for Mrs. Cherry *was riding in the car at the time of the collision.* Accord-

ingly, the distinction here is one of substance, rather than nomenclature.

## III.

The Court told the jury:

"If, in your answer to Interrogatory No. 2 or No. 3, you have found both parties are 50 per cent negligent, or you have inserted a zero for both parties, thereby finding neither party guilty of negligence, then that ends this lawsuit and you need not answer any further interrogatories; if your findings are otherwise, then answer the following:   *   *   *."

Appellants contend this was error, in that a finding that each party was guilty of 50% negligence would not have ended the lawsuit; both appellants and Ray Dedman would have still been equally responsible to Myrtle Dedman for the damage to her automobile. Appellants state that, in effect, the court told the jury that Mrs. Dedman could not recover unless the jury tipped the scale of fault in favor of her husband, and against appellants. It is pointed out that the jury did this by the bare margin of 55% to 45%. Under our holdings, we cannot consider this contention, for no objection was made by appellants to the form of the interrogatory, nor was any instruction requested covering this point.

## IV.

Appellants, as heretofore noted, included third party complaints against Ray Dedman, praying that if Myrtle Dedman obtained judgment against them, they recover over the amount of such judgment against the husband. The Uniform Contribution Among Tortfeasors Act, Sections 34-1001 through 34-1009, Ark. Stats. (1947) Anno., defines joint tortfeasors as:

"*   *   * two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."

52 American Jurisprudence, Section 112, p. 451, under the chapter heading, "Torts," states:

"There is much authority in favor of the principle that joint, or more precisely, joint and several, liability may exist notwithstanding the absence of concerted action on the part of wrongdoers. Thus, where the independent tortious acts of two or more persons supplement one another and concur in contributing to and producing a single indivisible injury, such persons have in legal contemplation been regarded as joint tort-feasors, notwithstanding the absence of concerted action."

See also *Applegate* v. *Riggall*, 229 Ark. 733, 318 S. W. 2d 596. We agree that, relative to the damage done Myrtle Dedman's car, appellants and Ray Dedman were joint tortfeasors. However, Section 34-1002 provides:

"A joint tortfeasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof."

We are of the opinion that appellants, upon discharging the judgment obtained against them by Myrtle Dedman, will be entitled to file their motion for judgment for contribution from Ray Dedman. The situation before us is a bit unusual, in that actions wherein relief is sought against an alleged joint tortfeasor usually involve bringing in a third person who is not already a party to the proceedings. Of course, in the present instance, the "third party" defendant was one of the persons who instituted the complaint, and Hodges is in the position of being liable to both appellees, while no liability was incurred by appellee Dedman to his wife because she did not sue him. However, we think, in the spirit of the Act, that Hodges is entitled to contribution without further litigation. Uniform Laws Annotated, Vol. 9, which contains the Uniform Contribution Among Tortfeasors Act, and discussion thereto, gives an interesting example relative to Section 7 (§ 34-1007 Ark. Stats.), under the heading "Third Party Practice, Amended Complaints, Counterclaims and Cross-Com-

plaints, and Motion Practice.''[5] Subsection (b) of subsection 3, § 34-1007, provides that ''a pleader may either move for judgment for contribution against any other joint judgment debtor where in a single action a judgment has been entered against joint tortfeasors one of whom has discharged the judgment by payment or has paid more than his pro rata share thereof. *If relief can be obtained as provided in this subsection no independent action shall be maintained to enforce the claim for contribution.*''[6] It is true that Mrs. Dedman obtained no judgment against her husband, but as pointed out— she filed no action against him. The jury found 45% negligence on the part of Dedman; thus, this amount of negligence has been definitely determined, and there is no occasion nor reason for a separate suit. Again, from Uniform Laws Annotated, Vol. 9, page 249, comment as to the meaning of this subsection is made as follows:

''Part (b) of this Subsection is included to afford contribution on motion among parties subject to joint judgment liability to the injured person, where they had neglected to file cross-claims against each other for contribution pursuant to the provisions of part (a) of this Subsection. This is in accordance with established practice in several jurisdictions.''

Here, of course, Hodges actually did file a cross-action against Dedman seeking contribution.

Accordingly, when appellants have discharged the judgment obtained against them by Myrtle Dedman, they

---

[5] "Suppose P is hurt by the concurrent negligence of A and B, and sues A for damages. Without this Subsection, P's action against A would proceed to judgment which A would pay. Then A would bring a separate action against B for contribution, in which the issues litigated would be substantially identical with those raised in P's action against A as far as evidence is concerned. Under this Subsection, A could make B a third-party defendant and proceed to prove that if he, A, is liable to P, B is also. The upshot would be that if he were successful in his claim against B, which would be litigated at the same time as P's against A, then A, on payment of P's judgment, could move in the same action for contribution against B, all of the germane issues having been settled in P's action. This practice is already well-established in Wisconsin and in several British jurisdictions." This illustration can be better understood by substituting Myrtle Dedman for "P," Wymer and Hodges for "A," and Ray Dedman for "B."

[6] Emphasis supplied.

may file their motion for judgment for contribution from Ray Dedman, and the court shall enter such judgment against Dedman for 45% of the amount paid by appellants to Myrtle Dedman in satisfaction of her judgment. With such modification, the judgment is affirmed.