**In re OWENSBORO DISTILLING COMPANY Debtor.**

**Russ WILKEY, Trustee, Plaintiff,**

v.

**INTER–TRADE, INC.; Dorn Case, Inc., Mojik Investments, Inc.; and Kijom Investments, Inc. Defendants.**

**Bankruptcy No. 4–88–00498.
Adv. No. 4–89–0055.**

United States Bankruptcy Court,
W.D. Kentucky.

Dec. 1, 1989.

J. Christopher Kohn, Tracy J. Whitaker, John T. Stemplewicz, Washington, D.C., for Department of Justice.

Russell Wilkey, Owensboro, Ky., Trustee.

Merritt S. Deitz, Jr., Sebree, Ky., for debtor.

Timothy Feeley, Louisville, Ky., Asst. U.S. Atty.

Joseph J. Golden, Louisville, Ky., Asst. U.S. Trustee.

Charles L. Lamar, Owensboro, Ky., for defendants.

## MEMORANDUM–OPINION

DAVID T. STOSBERG, Bankruptcy Judge.

The Court today addresses multiple jurisdictional issues raised by motions to dismiss filed by the three defendants. Undoubtedly, the cloud of jurisdictional uncertainty created by the recent decision of the Supreme Court of the United States in *Granfinanciera, S.A. v. Nordberg,* — U.S. ——, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) served as the catalyst for the motions. Unfortunately, the Supreme Court merely perpetuated the perplexing problem by deliberately declining to offer a scintilla of specific guidance.

Sufficiently troubled by the constitutional challenge presented, the Justice Department intervened in this action and actively participated in oral arguments to the court. In light of the elusive nature of the issues raised by the motion, all parties submitted thorough briefs. We conclude our introductory remarks by complimenting the parties for supplying an almost exhaustive amount of authoritative material.

## SCOPE OF ISSUES PRESENTED

Initially the defendants offered a broad, sweeping challenge to the constitutionality of 28 U.S.C. § 157, the source of the bankruptcy courts' jurisdiction, and only casually touched on the narrower issue of jury trials in Bankruptcy Court. In a supple-

mental memorandum, and during oral argument, the defendants subtly shifted their emphasis to the jury trial issue. Secondarily, the defendants compounded the complexity by casting doubt on this court's power based on an allegedly defective appointment process for Bankruptcy Judges. For a fledgling Bankruptcy Judge, sitting less than six months, the challenges posed create an almost incurable identity crisis. Nonetheless, the Court, with some temerity, now analyses the arguments and issues which nearly escape delineation.

## RIGHT TO A JURY TRIAL

■ With an abundance of reluctance we apply the principle that a court should always utilize a narrow approach in disposing of the motion and avoid addressing any broader issues raised. We express our reluctance because we feel that ultimately the precedents flowing from over 280 different Bankruptcy Judges will produce a crazy quilt pattern of law inapposite to the desired goal of uniform laws on bankruptcy.

Apparently, to determine whether the defendants deserve a jury trial, the Supreme Court intends that Bankruptcy Courts employ an arcane analytic technique:

The form of our analysis is familiar. 'First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.' *Tull v. United States*, 481 U.S. 412, 417–418, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987) (citation omitted). The second stage of this analysis is more important than the first. *Id.*, at 421, 107 S.Ct. at 1837. If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as factfinder. *Granfinanciera*, 109 S.Ct. at p. 2790.

Thus, instead of relying on specific bankruptcy provisions, we enjoy a brief sojourn back in time to Eighteenth Century British Law to decipher the history of 11 U.S.C. § 723 and determine whether it rests in law or equity.

Adopting this analysis we conclude that Section 723 falls within the category of a "wolf in sheep's clothing". As the parties to this adversary proceeding are already aware, Section 723 simply empowers the bankruptcy trustee to recover personal assets of general partners when it is apparent that partnership assets will be insufficient to fully satisfy all claims. Though 11 U.S.C. § 723 falls squarely within the core proceeding confines of 28 U.S.C. § 157(b)(2)(O), it still does scarcely more than create a conduit for the trustee to serve as the plaintiff in a contract action. Significantly, this *non* exclusive cause of action does not deprive any creditor of the right to act individually. Rather it provides relief that only parallels the individual creditor's right. To characterize Section 723 as a public right in face of an already existing (parallel) private right would require this Court to ignore the underlying nature of the contract action the trustee pursues. While that characterization might serve as a feeble justification for skillfully skirting the jury trial issue, we resist the temptation to use the faint-hearted approach, as we are mindful of the admonition in *Granfinanciera:*

Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders. But it lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury. (Footnote omitted). *Granfinanciera*, at p. 2795.

Having resolved that the type of claims involved mandate a jury trial, we now undertake the arduous task of determining whether a Bankruptcy Judge can conduct a jury trial.

## JURY TRIALS IN BANKRUPTCY COURT

█ Like Freddy Krueger or Jason[1], the issue of whether a Bankruptcy Judge can conduct a jury trial refuses to die. In *Granfinanciera* the Supreme Court breathed new life into the jurisdictional monster, yet declined to assist in dealing with the havoc it wreaks. Thus, for guidance this Court relies heavily on the following persuasive authorities:

(a) Ferriell, *Constitutionality of the Bankruptcy Amendments and Federal Judgeship Act of 1987*, 63 Am.Bankr.L.J. 110 (1989).

(b) Gibson, *Jury Trials in Bankruptcy: Obeying The Commands of Article III and the Seventh Amendment*, 72 Minn.L.Rev. 967 (1988).

(c) *In re G. Weeks Securities*, 89 B.R. 697 (Bankr.W.D.Tn.1988).

We supplemented these authorities with the principles of *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 and the Sixth Circuit viewpoint of 1984 Amendments expressed by the Honorable Boyce F. Martin, Jr. in *In re Salem Mortgage Company*, 783 F.2d 626 (6th Cir., 1986).

Congress, prodded by the Supreme Court mandate in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d. 598 (1982), attempted to stuff a square peg (Article I Court) into a round hole (Article III Court). 28 U.S.C. § 151 states:

In each judicial district, the bankruptcy judge in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district. Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or order of the district court.

We harbor little doubt that Congress intended to expand the powers of an Article I Bankruptcy Court to the broadest extent possible—without conferring bankruptcy judges with Article III powers. In 1978 Congress recognized the enormous impact Bankruptcy Courts exercised on the economy, and revamped the Bankruptcy Code complete with a grant of broad jurisdictional powers. Shot down by the Supreme Court in *Marathon* in 1984, Congress adopted the core/noncore dichotomy to hopefully allay the jurisdictional concerns. For the *second* time Congress granted some well deserved recognition of the impact of Bankruptcy Courts and their need for broad equitable powers, and attempted "to fashion a modern bankruptcy system which places the basic rudiments of the bankruptcy process in the hands of an expert equitable tribunal". *Granfinanciera*, Blackmun, J. dissenting, 109 S.Ct. at 2818. Anyone doubting the evolution of the power of Bankruptcy Judges must read Covey, *"Being A Judge Is Better"*, Conference News (Nat'l Conference of Bankr. Judges) 11 (Oct.1989). In his graphic depiction of the old days of 1959, Judge Covey notes that his 10 × 20 "closet" office also served as his courtroom and that he conducted court with one clerk, no secretary and no library. He expended a great deal of his time presiding over first meetings and hearing minor litigation with the major litigation being handled in State Court or District Court.

We digressed about the evolution of the court to present some perspective on how far Bankruptcy Courts have progressed. We believe that the Sixth Circuit recognized and applauded this evolutionary development when it expressed its viewpoint "that a broader interpretation of the statute more closely reflects the Congressional intent in adopting the new Bankruptcy laws." *Salem Mortgage* at p. 634. Nevertheless, while acknowledging the Sixth Circuit view, we do not view it as ample au-

---

**1.** In *Halloween* and *Nightmare on Elm Street*, these movie monsters manage to reincarnate themselves through various bizarre events. We hesitate to predict how many sequels of *Jurisdictional Nightmare in Bankruptcy Court* the Supreme Court will produce!

thority for this Court to conduct a jury trial.

■ To the contrary, the Court adopts compelling logic found in the excellent analysis by Judge William H. Brown in *Weeks, supra,* at 709–710:

"The reality is that there is no statutory right to a jury trial in bankruptcy proceedings except for those limited areas provided for under 28 U.S.C. Section 1411:

(a) Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.

(b) The district court may order the issues arising under section 303 of title 11 to be tried without a jury.

28 U.S.C. Section 959(a) does not grant an independent right for jury trial in suits against trustees; it merely preserves those rights that may otherwise exist. The same is true, for example, of Bankruptcy Rule 9020(d) in reference contempt proceedings and Bankruptcy Rule 7055, incorporating Federal Rule of Civil Procedure 55(b)(2) on default judgment hearings. The simple fact is that jury trials are statutorily authorized only in personal injury or wrongful death claims and possibly in 11 U.S.C. Section 303 issues. 28 U.S.C. Section 1411; see, e.g., *Matter of Hendon Pools of Michigan, Inc.,* 57 B.R. 801, 802 (E.D.Mich. 1986).

The absence of statutory authority does not deprive a litigant to a jury trial right if that right is Constitutionally guaranteed under the Seventh Amendment. *In re Beugen,* 81 B.R. 994, 997 (Bankr.N.D.Cal.1988). But, presence of a Constitutional right to jury trial does not then equate to the ability of the bankruptcy court to conduct that trial—it simply means that the bankruptcy court will need to determine if such a right exists. The litigants would then resort to another appropriate court—either state court or federal—for the jury trial.

This Court is persuaded that one may have a Constitutional right to a jury trial but the Constitution does not specify the forum. '[A]ny rights to a jury trial in the bankruptcy court are not constitutional in origin but must be created by statute.' *In re D.H. Overmyer Telecasting Co., Inc.,* 53 B.R. 963, 979 (N.D.Ohio 1984). Even in the Section 1411(a) jury issues, the bankruptcy court is not authorized to conduct the jury trial. 28 U.S.C. Section 157(b)(5). Rather, personal injury and wrongful death actions are tried in the federal district court, which is 'a court of law, and not only a court of equity.' King, 'Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984', *supra* at 704.

This Court does not lack the desire to conduct a jury trial nor does the Court wish to tax the parties with the burden of finding another court. The parties are entitled to a prompt trial but one in the proper court. This Court has not been persuaded that there is an inherent jury trial power in the bankruptcy court. Inherent power connotes essential power. Unlike such arguably necessary judicial powers as contempt or sanction, this Court does not need jury trial authority.

There are practical reasons why jury trials are not compatible with this Court's normal judicial activity. The Court does not suggest that it is too busy to conduct jury trials, but jury trials are, by nature, more time consuming then (sic) bench trials, and one could conclude that the Court's docket and case pace demands do not accommodate jury trials. *In re Southern Industrial Banking Corp.,* 66 B.R. 370, 375, 15 B.C.D. 249 (Bankr.E.D.Tenn.1986), *quoting from In re Best Pack Seafood, Inc.,* 45 B.R. 194, 195 (Bankr.D.Me.1984). This Court is not 'physically equipped nor staffed to' properly and efficiently handle jury panels and trials. *In re Astrocade,* 79 B.R. 983, 991, 16 B.C.D. 1306, 1312 (Bankr.S.D.Ohio.1987). The rapid pace of bankruptcy cases and proceedings do not mesh with jury procedures. 'Congress enacted the Bankruptcy Code to provide a prompt resolution of all bankruptcy

causes of action in order to expedite the settlement of the debtor's estate. Jury trials would "dismember" the statutory scheme.' *In re Chase & Sanborn Corp.*, 835 F.2d 1341, 1350 (11th Cir.1988), *cert granted*, [486] U.S. [1054], 108 S.Ct. 2818, 100 L.Ed.2d 920 (1988). Taken in isolation, this adversary proceeding would not destroy this Court's functions. To permit jury trials as a general concept is another issue.

However, more importantly, the expertise of this Court does not fit easily into jury trials. This is a specialized court, and it is a court which historically and inherently is one of equity in nature. *See, e.g., Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934); *see generally*, King, 'Jurisdiction and Procedure under the Bankruptcy Amendments of 1984,', *supra* at 703–704. As such, the judicial experience of the bankruptcy court does not include juries. To permit the conducting of jury trials in the bankruptcy court on an occasional basis may breed trial error through judicial inexperience. It would seem that the bankruptcy court either needs to regularly conduct jury trials or to never conduct them."

(Footnote omitted).

For emphasis, we repeat the comment of the Sixth Circuit in *Overmyer* that: "rights to a jury trial in the Bankruptcy Court are not constitutional in origin but *must* be created by statute". *Overmyer* at 979. Moreover, this Court feels that if Congress had granted the right to conduct jury trials, it would have essentially created a specialized Article III Judge with close to a lifetime tenure. Certainly a judge enjoying such status satisfies the principal officer test enunciated in *Morrison v. Olson, supra*. In *Morrison* the Supreme Court admitted:

> The line between 'inferior' and 'principal' officers is one that is far from clear, and the Framers provided little guidance into where it should be drawn. *Morrison*, 108 S.Ct. p. 2608.

The Court then enumerated a four-pronged test based on:

(1) removability from office;
(2) performance of limited duties;
(3) limited jurisdiction; and
(4) limited in tenure.

Rather than dwell on the topic, we merely observe that by applying this test to determine whether sitting Bankruptcy Judges are inferior officers, we stretch the definition of inferior officer to *its* broadest boundaries. We believe that application of the *Morrison* rationale confronts the appellate courts with a "Catch 22": a holding that Bankruptcy Judges can conduct jury trials would serve as the same rationale for a holding that such power causes Bankruptcy Judges to transgress the line from an inferior officer (which can be appointed under the current procedure) to a principal officer which can only be appointed by the President! In other words, if Bankruptcy Courts have the right to conduct jury trials, then the appointing process is defective and they have no power at all!

For a simple solution to the dilemma, we incorporate the comments of Professor Gibson and note that she, like Mr. Ferriell, expressed her premonitive comments about the core/noncore dichotomy, *prior* to *Granfinanciera:*

> Perhaps the most fundamental problem caused by authorizing bankruptcy judges to conduct jury trials in cases requiring an article III judge is that, in exercising this power, the bankruptcy judge crosses the hazy line separating adjunct and judge. No longer is the bankruptcy judge just an assistant acting under the close supervision of the district judge. Instead, the bankruptcy judge in effect exercises final, unreviewable authority over matters that may significantly affect the outcome of the case.

> The premise of article III, according to Professor Resnik, is 'that it matters that final decisions are made by specially empowered actors. If this is an accurate conclusion, then even if bankruptcy judges are constitutionally valid adjuncts to district court, they should not be permitted to conduct jury trials of noncore matters with the parties' consent. Allowing them to do so vests too much authority in these unprotected actors.

## CONCLUSION

Critics of the seventh amendment complain about the cost, inefficiency, and unreliability of jury trials. Nevertheless, the seventh amendment remains a vital part of the Constitution. Its commands may not be ignored just because a matter happens to fall within the jurisdiction of the bankruptcy court. Viewing bankruptcy courts as courts of equity operating outside the scope of the seventh amendment is no longer accurate. Instead, bankruptcy courts are courts of law and equity authorized to hear matters retaining their legal nature even though asserted in bankruptcy proceedings. Consequently, the Constitution requires that jury trial rights in these cases be recognized, whether or not Congress statutorily acknowledges the existence of such rights.

Although the understandable desire for efficiently adjudicating disputes cannot justify overriding the seventh amendment, it is relevant in determining how to implement the seventh amendment's commands. The present procedural structure of the bankruptcy courts is poorly suited for the efficient conduct of jury trials. Notwithstanding the seventh amendment's applicability to certain core proceedings, most cases in which parties are entitled to a jury trial are noncore. Without the parties' consent to entry of judgment by the bankruptcy judge, jury trials in noncore cases must be conducted by a district judge to avoid an unconstitutional de novo review of the jury's verdict.

The substantial delay in the underlying bankruptcy proceedings that will inevitably result from bifurcating adjudications of bankruptcy matters demonstrates the need for article III bankruptcy judges. Congress's decision in 1984 to continue to staff the bankruptcy courts with fixed-term judges, while maintaining the broad scope of bankruptcy jurisdiction introduced by the 1978 Act, invites uncertainty and constitutional challenge. The core-noncore scheme itself is difficult to apply, and its validity under article III is arguable. Assuming it is constitutional, however, the inefficient jury trial procedure will remain. Congress wisely decided in 1978 to consolidate all bankruptcy-related matters in the bankruptcy court. It should not undercut that policy by retaining a clumsy and inefficient court structure that requires some matters to be tried in the district court and forces the bankruptcy proceeding into abeyance while awaiting the district court's decision. Instead, in recognition of the need to execute the seventh amendment's requirements efficiently, Congress should reconstitute the bankruptcy courts as article III courts with full powers to conduct jury trials in all types of bankruptcy proceedings. Gibson, at pp. 1053–1054. (Footnotes Omitted).

We take no delight in posing this dilemma and appellate courts may view it more as perceived than real. Nor do we deem it our task to tame the jurisdictional monster. That burden ultimately will rest upon the shoulders of the Supreme Court which hopefully, in a sequel soon to be decided, will bury the monster it has resurrected.

Having decided that the litigants herein are entitled to trial by jury and having further decided that the bankruptcy court lacks authority to conduct such a trial, we must abstain from hearing the case and this day will enter an appropriate order transferring this case to the District Court.

**In re Santo Joseph CACOLICI, Debtor.**

**Santo Joseph CACOLICI, Plaintiff,**

**v.**

**TRANSOHIO SAVINGS, et al., Defendants.**

**Bankruptcy No. B88–01359. Adv. No. B88–0388.**

United States Bankruptcy Court, N.D. Ohio.

Oct. 13, 1989.

Frank R. Brancatelli, Eastlake, Ohio, for debtor-plaintiff.

William K. McCarter, McCarter and Weaver, Willoughby, Ohio, for defendant, Janice Cacolici.

## OPINION

DAVID F. SNOW, Bankruptcy Judge.

In this adversary proceeding the Court is required to decide whether certain claims of the Debtor's former wife, Janice Cacolici, are dischargeable under section 523(a)(5) of the Bankruptcy Code. The Debtor filed for reorganization under chapter 13 on April 15, 1988. His case was converted to chapter 7 on August 18, 1988, the same day this adversary proceeding was commenced by the Debtor primarily to determine the extent of Mrs. Cacolici's interest in the marital home (the "Home"), which was titled in the names of both parties. However, prior to the evidentiary hearing in this proceeding on July 12, 1989 (the "Trial"), the mortgagees of the Home obtained relief from the automatic stay and the Home was sold to a third party at a foreclosure sale without payment or distribution to or on behalf of the Debtor or Mrs. Cacolici except that the Debtor has continued in possession of the Home as tenant of the third party purchaser at the foreclosure sale.

For all practical purposes the foreclosure mooted the adversary proceeding except for Mrs. Cacolici's counterclaim that the Debtor's obligations to her arising out of their divorce are non-dischargeable under section 523(a)(5) of the Bankruptcy Code. The Trial was brief; only the Cacolicis were called. · Prior to the Trial, however, the parties had submitted various findings, orders and other papers (collectively the "Divorce Record") which comprised part of the record of their divorce case in the Lake County Common Pleas Court (the "State Court"). The parties filed trial briefs and post-trial briefs.

The claims at issue involve $1,000 relating to a 1976 Pontiac Firebird automobile and $9,180, and some other undetermined amount, which Mrs. Cacolici claims should have been paid her in connection with the sale of the Home. The parties stipulated at Trial that $1,891 in support arrearages were non-dischargeable. For the reasons set forth below I conclude that Mrs. Cacolici's other claims against the Debtor are also non-dischargeable.

This Court has jurisdiction in this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order No. 84 entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### Background

The parties were married either March 9 or August 9, 1975 (the Divorce Record shows both dates as the date of their marriage), and separated October 31, 1984. At that time Mrs. Cacolici and the couple's two minor children moved from the Home.

Mrs. Cacolici filed a divorce complaint in 1985 and the parties were divorced by the Final Judgment Entry of Divorce (the "Divorce Decree") entered by the State Court on October 28, 1987. During their separation the Debtor was subject to a support order which required him to pay Mrs. Cacolici $78 per week per child and $50 per week alimony. In the divorce case Mrs. Cacolici requested child support of $100 per child per week, alimony of $200 a month and an even split of the marital property. Under the terms of the Divorce Decree Mrs. Cacolici was granted custody of the two minor children and the Debtor was ordered to pay her $80 per week per child as child support and to cover the children's medical and related expenses. It denied alimony to both parties and appears to have required a substantially even split of the marital property. The Divorce Decree adopted and in part restated the findings and recommendations in the Referee's Report of June 18, 1986 (the "1986 Report") as it related to alimony and the division of the marital property.

According to the findings in the Divorce Record, Mrs. Cacolici's earning capacity was $1,000 a month ($12,000 a year); the Debtor's earning capacity was $3,466 per month ($41,592 a year). Mrs. Cacolici's needs were pegged at $2,100 per month and the Debtor's at $2,883 per month, without taking into account any support obligations. No evidence was introduced at the Trial to vary any of these figures. Therefore after taking into account the child support ordered against the Debtor, it appears that neither party could meet his or her needs solely on the basis of their projected incomes. However the Debtor's 350 percent greater earning capacity obviously afforded him considerably greater flexibility to adjust needs to income.

The parties' marital assets provided the only apparent resource available to bridge the gap between their incomes and their needs as projected by the State Court. One of their principal assets was a business called ICAE Inc. which the Debtor began in 1981 and which was sold to Donald and Dana Yuse in 1984. The proceeds of sale were expected to generate substantial funds which were ordered to be divided between the Debtor and Mrs. Cacolici. The Referee devoted considerable space in the 1986 Report to the ICAE business and the Debtor's efforts to divert Mrs. Cacolici's share to the Debtor's father, which the Referee characterized as a "sham". Apparently, however, little or no proceeds were realized; the Yuses defaulted on their obligations, including their obligation to pay the second mortgage on the Home, which they had assumed, and at some point filed bankruptcy. Mrs. Cacolici's only other significant source of funds was to be generated from the sale of the Home.

The Divorce Decree ordered the sale of the Home and the division of the net proceeds of sale between the parties—the first $9,180 was to be paid to Mrs. Cacolici and the balance to be divided equally between them. The basis for Mrs. Cacolici's $9,180 preference is not entirely clear. Her attorney suggested at Trial that it was designed to compensate her for the fact that the Debtor was allowed to retain $9,000 of marital household goods compared to less than $1,000 retained by Mrs. Cacolici. Pending the sale, the Debtor was ordered to pay all installments on the three mortgages on the Home and to hold Mrs. Cacolici harmless from liability thereunder. The State Court ordered that the Home be listed for sale with Smythe Cramer at $130,-000 and, if the Home was not sold, ordered the price reduced by $1,000 per month until it was sold.

In any event, the Home was never listed for sale, apparently because of the Debtor's unwillingness to permit it to be shown. Instead the Debtor filed a motion with the State Court to purchase the Home himself. That motion came on for hearing on January 12, 1988; Mrs. Cacolici was not represented at that hearing. From the Referee's report of that hearing (the "1988 Report") it appears that the Debtor had not paid Mrs. Cacolici the $1,000 for the Firebird or $1,891.08 in support arrearages. The principal issue at that hearing was the amount of an imputed real estate commission to be deducted from the purchase price. The 1988 Report and the judgment

entry confirming it (the "Sale Order") authorized the Debtor to purchase the Home for $130,000 and, after deducting an imputed seven percent real estate commission, paying mortgages and taxes and dividing normal closing costs, ordered the Debtor to pay Mrs. Cacolici her arrearages and her $9,180 preference before splitting the remaining proceeds.

The Sale Order required the Debtor to keep current the mortgages and taxes on the Home. It did not, however, order the Debtor to buy the Home. It merely ordered him to list it with Smythe Cramer if he did not complete the purchase within 60 days. Therefore, I find that Mrs. Cacolici's claim against the Debtor for $9,180 as well as for any excess depends on finding not only that the Debtor breached obligations owing to her in respect of the Home but, if he did, quantifying her damages arising from his breach.

Although the Divorce Decree and Sale Order did not expressly order the Debtor to pay Mrs. Cacolici $9,180 or any other amount in respect of the Home, they did expressly order him to keep the mortgages and taxes current and to make appropriate efforts to sell the Home or permit its sale, if he did not buy it. These obligations were clearly imposed upon him for Mrs. Cacolici's benefit and she would have a claim against him in the event of their breach.

The Debtor sought to avoid responsibility for failing to keep the mortgages current because of the Yuses' default under the second mortgage which they had assumed in connection with their purchase of the ICAE business. He also sought to avoid responsibility for his failure to purchase the Home and the ensuing foreclosure because of Mrs. Cacolici's failure to agree to purchase terms different from those approved at his request by the State Court. However, neither circumstance excused his failure to perform his obligations to Mrs. Cacolici.

First, there is nothing in the Divorce Record and no evidence was adduced at Trial to indicate that the Yuses' default excused the Debtor's obligation to keep the mortgages current. At the May 1986 hearing the Debtor testified that the Yuses had defaulted on four payments on the second mortgage and that he had made up two of them. There is nothing in the 1986 Report of that hearing or the Divorce Decree to suggest that the Yuses' continuing default would excuse his obligations to Mrs. Cacolici to keep that mortgage current or that he requested such relief. Paragraph G of the Divorce Decree provided expressly for the splitting of the proceeds of the ICAE business if the Yuses' default continued, without qualifying the Debtor's obligation to keep current the mortgages on the Home. Nearly two years after the Debtor had complained of the Yuses' default at the May 18, 1986 hearing the Sale Order confirmed his unconditional obligation to maintain current payments on the mortgages. Had the mortgages been kept current, there would have been no foreclosure and at some point, presumably, the Home would have been put on the market and sold as required by the Sale Order.

Mrs. Cacolici's alleged failure to cooperate in his purchase of the Home through a second mortgage refinancing reflects only his effort to reduce the purchase price stipulated in the Sale Order and to retain the Home while paying her as little as possible. The Sale Order afforded him the right to purchase her interest based upon a $130,000 purchase price. But the evidence reveals that he did not attempt to enforce the terms of the Sale Order. Instead, he endeavored to renegotiate the deal. I find no evidence that either her negotiations with the Debtor or her failure to reach a new agreement with him constituted her abandonment of her rights to have the mortgages and taxes maintained current and the Home sold under the terms of the Divorce Decree and Sale Order. Therefore, he is liable to her for damages for breach of the obligations. The measure of damages is the amount she would have received had the Debtor complied with his obligations and had the Home been sold at a brokered sale in accordance with the terms of the Divorce Decree and Sale Order.

Since the Home was sold at foreclosure, not at a brokered sale, her damages cannot be computed with precision. However from the evidence presented it appears reasonably clear that had the Debtor complied with his obligations the net sale proceeds would have been sufficient to fund her $9,180 preference. It appears likely that she would, in fact, have received more. But how much more is uncertain because of discrepancies between the 1986 Report and the Divorce Decree on the one hand and the 1988 Report and the Sale Order on the other.

The only explicit finding as to the value of the Home in the Divorce Record is contained in the 1986 Report. The Referee found the property to have a value of $117,000 ($115,000 on a quick sale). At the pre-trial hearing in the State Court Mrs. Cacolici asserted the Home was worth $130,000 to $150,000; the Debtor had valued it at $141,000. By the time of the evidentiary hearing on May 8, 1986, her estimate was $130,000; his had dropped to $105,000. The Debtor's offer to purchase the Home confirms that the higher valuation was correct, or had become correct by 1988 when the Debtor made his offer.

His proposal to purchase the Home for $130,000 is the Debtor's admission that the Home was worth at least that amount. He had lived in the Home in the intervening period and had obtained a commitment for second mortgage financing to pay off the second mortgage and buy out Mrs. Cacolici. He was in the best position to fix a realistic sales price and there is no basis in the record to suggest that he would overstate its value to his detriment and Mrs. Cacolici's benefit.

I find the fact that the foreclosure sale generated no net proceeds not persuasive on the issue of value, both because of its character as a forced sale and because the Home was purchased by a third party who has allowed the Debtor to remain as a tenant. On the basis of the foregoing I find the value of the Home to be $130,000. The appropriate deductions from this value must be determined from the Divorce Record.

There are, as noted, some apparent contradictions and discrepancies between the 1986 Report and Divorce Decree and the 1988 Report and the Sale Order. For example, the former showed the payoff balance on the second mortgage as $14,615. A year and a half later the Referee indicated that $17,310.06 was owing on that mortgage and apparently used this larger amount in his calculation that the parties would split $1,582 after payment of the mortgages, Mrs. Cacolici's $9,180 preference and the other deductions. Since the Debtor was obligated to keep the second mortgage current, use of this higher figure appears inconsistent with the Divorce Decree and unfair to Mrs. Cacolici, as does the fact that the Sale Order provided for payment of the Debtor's $2,891.08 arrearages in respect of the Firebird and support payments. There was nothing in the Divorce Decree to suggest that her split of the net proceeds from the Home should be reduced by these payments. These apparent inconsistencies may have resulted from the fact that Mrs. Cacolici was not represented at that hearing. Nevertheless, it appears clear that Mrs. Cacolici would at the least have received her $9,180 preference had the Home been sold for $130,000. Notwithstanding the apparent overstatement of deductions in the 1988 Report, the Referee nevertheless concluded that there would be a small amount for the parties to split.

It is not possible for me to harmonize the findings and orders of the State Court to determine how much more than $9,180 Mrs. Cacolici would be entitled to. Under these circumstances it appears appropriate for the State Court to reconcile its findings and orders on this issue. Therefore, this Opinion is not intended to preclude Mrs. Cacolici from taking appropriate action in the State Court to prove the extent of her damages, if any, in excess of $9,180, based upon the premise that the Home had been sold in a brokered sale for $130,000 in accordance with the orders of the State Court.

In summary, Mrs. Cacolici has established valid claims of $1,000 in respect of the Firebird and of at least $9,180 in re-

spect of the Home. The next question is whether these claims are non-dischargeable under section 523(a)(5) of the Bankruptcy Code. The answer is to be sought with the guidance of two Sixth Circuit cases. *In re Calhoun,* 715 F.2d 1103 (6th Cir.1983), and *In re Singer,* 787 F.2d 1033 (6th Cir.1986).

### Discussion

Section 523(a)(5) renders non-dischargeable claims to a former spouse "for alimony to, maintenance for, or support of such spouse...." In *Calhoun,* the court confirmed that the question of whether a debt constituted non-dischargeable support or a dischargeable property settlement is governed by federal not state law. Although alimony, support, maintenance and property settlements comprise the stock-in-trade of the domestic relations court, that court does not usually address the conflict between bankruptcy and domestic relations goals embodied in section 523(a)(5). That conflict stems from the necessity of balancing the debtor's right to a fresh start against the needs of the debtor's spouse or children for support. This means that the bankruptcy court must look at the circumstances reflected in the parties' settlement agreement or divorce decree; it cannot simply rely upon characterizations made by the parties in their agreement or the divorce court in its decree to achieve other ends.

> "... [R]egardless of how a state may choose to define alimony, a federal court, for purposes of applying the federal bankruptcy laws, is not bound to a label that a state affixes to an award ... [C]onsistent with the objectives of federal bankruptcy policy, the substance of the award must govern."

*Erspan v. Badgett,* 647 F.2d 550, 555 (5th Cir.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

According to *Calhoun* the bankruptcy court must make the following factual determinations. First, it must find that a support obligation was intended. It must then determine whether the obligation had the actual effect of providing support. Finally it must determine wheth-

er the amount of support is manifestly unreasonable under traditional notions of support. The burden of proof on each of these questions is on the party seeking to establish that the debt is non-dischargeable.

The Sixth Circuit again considered non-dischargeability under section 523(a)(5) in *In re Singer, supra.* In this case the court held that an award characterized as a property settlement might nevertheless be in the nature of alimony, support and maintenance and thus non-dischargeable under 523(a)(5).

At issue in *Singer* were periodic payments provided in the parties' separation agreement. Mrs. Singer, who was 60 at the time of the divorce, had not worked outside the home during the parties' 18-year marriage. The parties' separation agreement obligated Mr. Singer to pay her $800 per month for a period of years—an amount nearly identical to his payments to her during their marriage and separation. In their separation agreement, however, Mrs. Singer had otherwise released Mr. Singer from any obligation to provide future support. Mr. Singer argued that this characterization was binding on the bankruptcy court and compelled the conclusion that the payments were a property settlement and hence dischargeable. The court held, however, that the dispositive fact was Mrs. Singer's continued need for support; it affirmed the bankruptcy court's decision that the payments, although constituting a property settlement, were also in the nature of non-dischargeable maintenance and support.

> "While the parties have cast the argument before us ... as whether certain property ... was awarded as alimony or as property settlement, such a characterization is not particularly constructive.... The two terms are not ... mutually exclusive. Under the law of Ohio the parties may, upon a divorce, agree to how they will divide up the property, and such an award of property to a spouse may be required as alimony."

*In re Singer, supra,* concurring opinion 787 F.2d at 1037. *See also In re Swic-*

*zkowski,* 84 B.R. 487 (Bankr.N.D.Ohio 1988).

■ Applying the standards of *Calhoun* and *Singer,* I conclude that Mrs. Cacolici has borne her burden of proving that the Debtor's obligations to her in respect of both the Firebird and the Home were intended for Mrs. Cacolici's support, were necessary for her support and would, if made, have had the effect of providing support. These obligations constitute a property settlement in the nature of maintenance and support and are non-dischargeable under section 523(a)(5).

According to the cases, a number of factors bear on this determination, including the length of the marriage, the existence of minor children, the spouse's need for support and the relative earning capacity of the parties. *See, e.g., In re Calhoun, supra* at 1110; *In re Singer, supra* at 1035; *In re Goin,* 808 F.2d 1391 (10th Cir.1987). This adversary proceeding involves a lengthy marriage, two minor children, a significant imbalance between the parties' earning capacities and, most significantly, the fact that Mrs. Cacolici's needs, notwithstanding child support payments, substantially exceed her income. Without the division of marital assets provided for in the Divorce Decree and Sale Order, there were no assets to fund Mrs. Cacolici's basic needs. "... [I]f a settlement agreement fails to provide explicitly for spousal support, the court may presume that a so-called property settlement is intended for support, when circumstances indicate that the recipient spouse needs support." *In re Singer, supra* at 1035, citing with approval *Shaver v. Shaver,* 736 F.2d 1314 (9th Cir. 1984). *See also In re Leupp,* 73 B.R. 33 (Bankr.N.D.Ohio 1987).

Under these circumstances the Debtor's obligations in respect of the Firebird and the Home should be viewed as intended by the State Court for Mrs. Cacolici's support and maintenance. Otherwise the Divorce Decree condemned her to financial failure and bankruptcy. The State Court's denial of alimony makes sense only on the assumption that the payments called for in the division of the marital assets would be made. Under the facts of this case, moreover, it would be particularly inappropriate to grant the Debtor his fresh start at the cost of denying Mrs. Cacolici's recourse against him for breach of his obligations to her in respect of the Home and the Firebird.

Section 523(a)(5) mandates that support obligations be respected in the bankruptcy process. "[S]ection [523(a)(5)] departs from the general policy of absolution, or 'fresh start', that is embodied in the federal Bankruptcy Act. It enforces an overriding public policy favoring the enforcement of familial obligations." *Shaver v. Shaver, supra* at 1315. As discussed above, it does not appear that the Debtor made a good faith effort to comply with his obligation to Mrs. Cacolici to sell the Home so that she could receive her share of marital assets. Instead he attempted to retain the Home and force her to accept what he chose to pay her.

Notwithstanding the foreclosure and his bankruptcy, his effort has been partially successful. He retains possession of the Home; she has lost her interest in the Home without receiving a cent. To also relieve the Debtor of the obligation to pay her the damages caused by his breach would defeat the purpose of section 523(a)(5) and effect an abuse of the bankruptcy process. *See In re Lariccia,* 110 B.R. 822 (Bankr.N.D.Ohio 1989). Under these circumstances I have no difficulty concluding that Mrs. Cacolici's right to support weighs heavier in the balance required by section 523(a)(5) than the Debtor's right to a fresh start.

The court's order in conformity with this opinion is attached.

## JUDGMENT

An opinion having been rendered by the Court in this adversary proceeding,

IT IS ORDERED, ADJUDGED and DECREED that:

1. The amended complaint against Society National Bank, Transohio Savings Bank, Myron E. Wasserman, Alan Treinish

and Janice Cacolici be, and it hereby is, dismissed.

2. Janice Cacolici's counterclaim against Santo Joseph Cacolici be, and it hereby is, granted to the extent that, pursuant to 11 U.S.C. § 523(a)(5), the following obligations are excepted from the discharge granted pursuant to 11 U.S.C. § 727:

(A) $1,891 in respect of support arrearages;

(B) $1,000 in respect of the Pontiac Firebird automobile; and

(C) $9,180 plus any additional damages as may be subsequently determined by the Lake County Common Pleas Court in respect of the marital home located at 5775 Oriole Court, Mentor, Ohio.

**In re Paul J. FRAGAPANE and Janice E. Fragapane, Debtors.**

**Paul A. FRAGAPANE and Janice E. Fragapane, Plaintiffs,**

v.

**Mary Ann RABIN, et al., Defendants.**

Bankruptcy No. B89–811.
Adv. No. B89–155.

United States Bankruptcy Court,
N.D. Ohio, E.D.

Nov. 30, 1989.

Steven Davis, Cleveland, Ohio, for plaintiffs.

Mary Ann Rabin, Cleveland, Ohio, trustee.

Henry Epp, Cleveland, Ohio, for defendant, Gus Georgalis.

MEMORANDUM OF OPINION
AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

The Plaintiffs, Paul and Janice Fragapane (Debtors), seek to avoid a judgment lien which attached to certain real property owned by them prepetition pursuant to § 522(h) of the Bankruptcy Code.[1] Upon a review of the parties' respective briefs, the following findings and conclusions are hereby made.

The facts are generally undisputed. Prior to the Debtors' filing their petition for relief under Chapter 7, the Defendant, Gus Georgalis (Georgalis) obtained a judgment against the Debtors in an amount of $21,215.00, plus costs and a specified rate of interest. Following the receipt of the judgment, Georgalis caused a judgment lien to be placed upon certain real property owned by the Debtors located in Westlake, Ohio. The lien was perfected within ninety days of the Debtors' filing their bankruptcy peti-

---

1. 11 U.S.C. § 522(h):

The debtor may avoid a transfer of property of the debtor or recover a setoff to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—(1) such transfer is avoidable by the trustee under section 544, 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title; and (2) the trustee does not attempt to avoid such transfer.

tion. Once the Debtors' Chapter 7 petition was filed and the case trustee took no action to avoid the lien, this action ensued.

The dispositive issue is whether the Debtors can avoid a prepetition lien where no such action was exercised by the duly appointed trustee. Georgalis contends, *inter alia*, that the Debtors are without authorization to avoid his judgment lien since there exists adequate value in the property to protect their statutory exemption entitlement and pay any liens affecting the property. For the following reasons, it is hereby determined that the position asserted by Georgalis is without merit, and the subject lien may be avoided by the Debtors.

Generally, § 522 of the Bankruptcy Code [11 U.S.C. 522, *et seq.*] addresses the subject of exemptions. Subsection (h) of that section, however, provides an avoidance provision for a debtor to avoid a transfer or recover a setoff in certain instances where the case trustee has not attempted to do so. Once avoidance is successfully pursued under § 522(h), the debtor may exempt the property from the estate to the extent allowed if the prepetition transfer was made involuntarily and the debtor took no action to conceal the property. 11 U.S.C. § 522(g). Further, any avoidance sought by the debtor under provisions of §§ 544, 545, 547 and 548 are subject to any applicable limitations of § 546 of the Bankruptcy Code.

In the present action, the trustee took no action to avoid the lien which attached within ninety days prepetition. The Debtors' action seeks to avoid that transfer under § 547 as a preferential transfer. An examination of the pleadings reveals that the parties have stipulated to the requirements of a § 547 preferential transfer. In fact, Georgalis has asserted that the trustee, "although clearly empowered to do so, chose not to set aside the Georgalis lien as a preference" (Reply to Motion For Judgment, p. 4). Under § 522(h), the Debtors clearly were empowered to seek avoidance of the subject lien under one of several cumulative avoiding statutes. They chose to seek avoidance under § 547(b) which has been achieved by the parties' stipulation. As the legislative history to § 522(g) pro-vides, this section is primarily designed to give the debtor the rights the trustee could have, but has not, pursued. See, S.Rep. No. 95–989 to accompany S. 2266, 95th Cong., 2d Sess. (1978) p. 76; H.R. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) pp. 360–363, U.S.Code Cong. & Admin.News 1978, p. 5787.

Under applicable nonbankruptcy law, the debtors are entitled to an exemption of $10,000.00 in the subject real property. This exemption amount was duly claimed by the Debtors. Georgalis' argument that the Debtors are not empowered to avoid the lien since the property has sufficient value to pay the Debtors' exemption amount in addition to any liens is a non-issue. The provisions of § 522(h) are not conditioned upon whether or not an exemption is impaired. Rather, it gives a debtor unfettered authority to avoid a lien under one of the avoiding statutes, subject only to § 546, where the trustee has not attempted to avoid the prepetition transfer. Thusly, it is hereby held that the lien constituted a preferential transfer avoidable under § 547; the Debtors are statutorily empowered to bring this action under § 522(h).

Accordingly, judgment is hereby granted in favor of the Plaintiffs and the subject lien is hereby avoided.

IT IS SO ORDERED.

**In re Wayne Franklin LANG, Debtor.**

**Dennis and Theresa STAHL, Plaintiffs,**

v.

**Wayne Franklin LANG, Defendant.**

**Bankruptcy No. B88–4705.**
**Adv. No. B89–100.**

United States Bankruptcy Court,
N.D. Ohio, E.D.

Dec. 6, 1989.

John D. Falgiani, Jr., Austintown, Ohio, for plaintiffs.

Mary Ann Rabin, Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

In this adversary proceeding Plaintiffs Dennis and Theresa Stahl seek to have their investments in certain limited partnerships declared nondischargeable debts of Wayne Franklin Lang (Debtor). The Debtor filed his petition in bankruptcy on December 13, 1988. Jurisdiction of this matter is conferred on this Court under 28 U.S.C. § 1334 and General Order No. 84 of this District. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Plaintiffs' objection is premised on sections 523(a)(2), (a)(4) and (a)(6) of the Bankruptcy Code. Following a trial of this matter, arguments of counsel and an examination of the evidence admitted, the following constitutes the Court's findings and conclusions:

### I.

Plaintiffs have been acquainted with the Debtor for approximately 15 to 20 years. In 1985 and 1986, Plaintiffs retained the Debtor to perform accounting and tax preparation services. The Debtor had also performed these services for the Plaintiffs in previous years. In the course of tax preparation in 1985, Dennis Stahl asked the Debtor about establishing an I.R.A. account. The Debtor then aided Plaintiff in setting up an I.R.A. account for $2,000.00 with First Trust Corporation as Trustee (See DX G) and suggested that his I.R.A. be used to purchase a one-half unit in West Court Apartments Ltd. partnership (West Court). Both the I.R.A. adoption agreement and the I.R.A. investment authorization were executed and signed by Dennis Stahl on April 11, 1985. (*Id.*)

The following year Theresa Stahl set up a similar I.R.A. with First Trust in the amount of $3,000.00 ($2,000.00 for a contribution for 1985 and $1,000.00 for 1986). (*See,* DX H.) At Debtor's suggestion, the $3,000.00 was used to purchase one share in Hahira Georgia Motel Ltd. partnership (Hahira). The Debtor was a general partner in both of these partnerships. These I.R.A. contributions and subsequent investments are the subject of this adversary proceeding.

### II.

Plaintiffs claim that they were induced to make these I.R.A. contributions in reliance on the Debtor's fraudulent representations that the investments were without risk and would be highly profitable. They also allege that the Debtor further failed to disclose his conflicts of interest resulting from his position as a general partner for these and other real estate limited partnerships as well as the fact that he received monetary compensation from the partnerships.

The Debtor contends that he did not defraud the Plaintiffs, that all risks and potential conflicts of interest were described in the offering circulars of both partnerships and were fully disclosed to the Plaintiffs.

11 U.S.C. § 523(a)(2)(A) excepts from discharge debts for money, property, services.... to the extent obtained, by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's.... financial condition....

The elements of § 523(a)(2)(A) are: (1) that the claimed representations were made; (2) that at the time they were made the debtor knew they were false; (3) that they were made with the intention and purpose of deceiving plaintiffs; (4) that plaintiffs reasonably relied on such representation having been made. *In re Hospelhorn*, 18 B.R. 395, 397–98 (Bankr.S.D.Ohio 1981). A creditor seeking an exception from discharge under § 523(a)(2) must sustain this burden by clear and convincing evidence. *In re Phillips*, 804 F.2d 930 (6th Cir.1986). Respecting their allegations under § 523(a)(2), Plaintiffs have failed to meet their burden. First, no clear and convincing evidence has been demonstrated to show that debtor obtained property by false pretenses or a false representation. Even if Plaintiffs are correct in asserting that debtor represented that the investments in the limited partnerships were risk-free, a claim of this nature appears to be in the nature of "puffery" and should not be the basis of reasonable reliance. *See, In re Stone*, 91 B.R. 589, 592 (D.Utah 1988). Further, while testimony is not conclusive as to whether the Plaintiffs were told of the risks and were actually shown the offering circulars in which the risks and conflicts of interest were clearly described, Plaintiffs did sign an I.R.A. Investment Authorization authorizing First Trust to purchase the units in their behalf. (DX G & H).

■ As to actual fraud, § 523(a)(2)(A) includes only those frauds involving moral turpitude or intentional wrong, and does not extend to fraud implied in law which may arise in the absence of bad faith or immorality. *In re Black*, 787 F.2d 503, 505 (10th Cir.1986); *In re Novak*, 97 B.R. 47, 56 (Bankr.D.Kan.1987). In this case Plaintiffs presented no evidence of any actual fraud on the part of the Debtor that would have caused them to invest in either the West Court or the Hahira partnerships.

■ Plaintiffs next contend that the debt to them should be excepted from discharge under § 523(a)(4), which refers to fraud or defalcation committed when a debtor is acting in a fiduciary capacity. The threshhold determination which must be made is whether the debtor was actually acting in a fiduciary capacity within the meaning of the statute. While state law is important in determining when a trust relationship exists, the issue is ultimately a federal question. *See, In re Short*, 818 F.2d 693 (9th Cir.1987); *In re Johnson*, 691 F.2d 249, 251 (6th Cir.1982). Here the offering circulars for both West Court and Hahira speak of the fiduciary duties owed by the general partners to the limited partners. The broad, general definition of fiduciary, involving confidence, trust and good faith, is inapplicable in a dischargeability context, thus excluding ordinary commercial relationships from the meaning of fiduciary under the Bankruptcy Code. *In re Schultz*, 46 B.R. 880 (Bankr.D.Nev.1985); *In re Angelle*, 610 F.2d 1335, 1338 (5th Cir.1980).

■ The term "fiduciary" applies only to express or technical trusts and does not extend to implied trusts, which are imposed on transactions by operation of law as a matter of equity. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *Johnson, supra*, at 251. Plaintiffs rely on the fact that Debtor, as a general partner, was a fiduciary with respect to any limited partners in West Court and Hahira. Plaintiffs also rely on Debtor's appointment as attorney-in-fact, pursuant to the written subscription agreements. Both the partnership relationship and the attorney-in-fact relationship arose from ordinary commercial transactions and not from any technical, express, or statutorily imposed trust. As discussed above, these types of relationships do not impose a fiduciary duty that would subject Debtor's actions to liability under § 523(a)(4). Thusly, the Plaintiffs' contentions under § 523(a)(4) must fail.

■ Finally, Plaintiffs assert that Lang's debt to them should be excepted from discharge under § 523(a)(6), which operates to make nondischargeable any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Conversion of another's property will give rise to a nondischargeable debt under § 523(a)(6) if the conversion is willful and malicious. *In re Pommerer*, 10 B.R. 935 (Bankr.D.Minn. 1981); *In re Schmehl*, 57 B.R. 546, 14 B.C.D. 1 (Bankr.N.D.Ohio 1986). The terms are defined in the Sixth Circuit decision *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987). In that case, the Court of Appeals held that "willful" means a deliberate and intentional doing of an act that necessarily leads to injury. In defining "malicious," the *Perkins* court accepted the definition in 3 *Collier on Bankruptcy*, ¶ 523.16 at 523–11 (15th ed. 1986):

> An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite, or ill-will.

■ Consequently, a creditor need not show a specific intent to injure, but rather that intent may be inferred by the nature of the act. If an intentional act necessarily produces harm and is without just cause or excuse, it is willful and malicious even absent proof of an intent to injure. *Perkins* at 394; *In re Cecchini*, 780 F.2d 1440 (9th Cir.1986); *In re Franklin*, 726 F.2d 606, 610 (10th Cir.1984). It is the intent to do the act which is the operative legal event and not the intent to do harm. *In re Nuckols* 47 B.R. 731, 735, 12 B.C.D. 1125 (Bankr.E.D.Va.1985); *In re Guy*, 101 B.R. 961, 982 (Bankr.N.D.Ind. 1989).

■ Here, the Debtor deliberately placed Plaintiffs' I.R.A. savings in a high-risk investment. The Debtor was personally well-acquainted with Plaintiffs and with their financial situation. Plaintiffs testified that they wished to place their money in an investment without risk (Dennis Stahl, Direct exam; Theresa Stahl, Direct exam). This testimony was unrefuted. Both Plaintiffs stated that if they had known of the risks they would not have made the investments in West Court and Hahira. (*Id.*) The risk factors are set forth in the offering circular and include: changes in law and government regulations, general or local economic conditions, interest rates and other operating expenses, rent collection difficulties, vacancies, abilities of the property manager, limited net worth of the general partners, and potential conflicts of interest resulting from the fact that the general partners own the management company which manages the property and also have possibly conflicting interests in other properties. (PX–7, pp. 5–7).

The offering circulars and subscription agreements clearly set forth the suitability requirements for a subscriber in the partnerships. The West Court circular contains the following suitability standards:

> The purchase of these limited partnership units involves certain risks and is suitable only for persons of adequate means who have no need for liquidity in their investments.... The limited partnership units are not readily marketable and of a long-term nature. Only persons whose income is subject to high rates of federal income taxation will derive the full economic benefits expected to be realized by the Partnership in its early years of operation. Interests will be sold only to a purchaser who has either (a) a minimum annual gross income of Thirty Thousand Dollars ($30,000.00) and a net worth (excluding from computation thereof his home, home furnishings and personal automobiles) of not less than Thirty Thousand Dollars ($30,000); or (b) a net worth (as computed above) of not less than Seventy–Five Thousand Dollars ($75,000).... The General Partners require that each limited partner have sufficient business experience and knowledge to evaluate the merits and the risks of purchasing the offered limited partnership units. The selling broker-dealer will make reasonable inquiry to assure that there is compliance with these suitability standards. The General Partners

will not accept subscriptions from any person who does not represent in the Subscription Agreement that he has such business knowledge or experience unless the subscriber requests that his representative be furnished with this offering circular. The General Partners will rely upon the representations of the subscriber in the Subscription Agreement.

The net worth standard for Hahira is identical to that of West Court. The subscriber, either alone or together with a Purchaser Representative, should have knowledge and experience in nonmarketable, tax-incentive investments and should have no need for liquidity. (PX 8, p. 2). The investor should also have such knowledge and experience in business and financial matters in general and be capable of evaluating the merits and risks of purchasing the units unless the subscriber represents that he, together with any purchaser representative such as an attorney, accountant, or tax advisor, has such business knowledge and experience and requests that his purchaser representative be furnished with a copy of this offering circular. The General Partners rely on the representations made by the subscriber in his Subscription Agreement. (*Id.*, pp. 5–6).

Plaintiffs clearly did not meet these suitability standards. Based upon the Debtor's long-standing familiarity with the Stahls, he knew they did not meet the above standards. As to their net worth, testimony was conflicting as to whether their annual income was in excess of $30,000.00, but it was unrefuted that their net worth was less than $30,000.00. Under "(a)" of the financial requirements, this standard is in the conjunctive; both prongs must be met to demonstrate suitability. In any event, they were not in a sufficiently high tax bracket to benefit from the tax advantages available to high income investors prior to 1986. Their money, when placed in an I.R.A. account, was already sheltered. There was no justifiable tax reason to place the Stahls' funds in a real estate limited partnership both because any· profit was already sheltered in the I.R.A.s and they otherwise were incapable of writing off any losses of a partnership against their taxes. (Direct EX., Sara Robechek, Expert Witness). Debtor was both the Account Executive and the Financial Planner for Plaintiffs at the time of their investment. (DX D, DX F). The West Court circular contains the following language: "Each potential investor is strongly urged to consult his own tax advisor concerning the effects of Federal Income Tax law and regulations on his investment in the Partnership and on his individual tax situation." (PX 7, p. 8). Even though transfer of Plaintiffs' money from an I.R.A. to high risk illiquid, non-marketable partnerships was clearly in derogation of Plaintiffs' express goal of a risk-free retirement plan, the Debtor put the whole investment scheme in motion, thereby intentionally performing an act that necessarily invited injury. Malice may be shown by a debtor's knowledge that his act will harm a creditor and the Debtor's nontheless proceeding in the face of that knowledge. *In re Dorman*, 98 B.R. 560 (Bankr.D.Kan.1987). This presentation of malice occurred in the present case.

### III.

§ 219, money deposited in an I.R.A. must be based on an individual's compensation (or income in the case of income from self-employment). When the only income an individual receives is from dividends, interest, and capital gains, it does not constitute "compensation" within the meaning of § 219. *Miller v. C.I.R.,* 77 T.C. 97 (1981). "Compensation" refers only to wages, salaries, and professional fees. *See* 1.219–1(e)(1), Income Tax Regs. None of Theresa Stahl's money was "compensation" within the meaning of the statute.