**In re Gary Steven LAMB & Charles Granville Lamb, partners d/b/a Rubenstein's, Debtors.**

**Richard P. JAHN, Jr., Trustee, Plaintiff,**

**v.**

**Charles Granville LAMB, Defendant.**

**Bankruptcy No. 1–81–02256.
Adv. No. 1–82–0424.**

United States Bankruptcy Court,
E.D. Tennessee.

Dec. 23, 1983.

See also 29 B.R. 950.

Patrick C. Taintor & Harold L. North, Jr., Tanner, Jahn, Atchley, Bridges & Jahn, Chattanooga, Tenn., for plaintiff.

Henry K. Jarrett, III, Hanish, Davenport, Rosenberg & Weiner, Louisville, Ky., for defendant.

MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

Despite the caption of this bankruptcy case, the main question is whether Charles Lamb and Gary Lamb were partners in the

business known as Rubenstein's. The bankruptcy petition commenced a case only for the alleged partnership and not for Gary Lamb and Charles Lamb as individuals.

The partnership's case was converted from a chapter 11 reorganization to a chapter 7 liquidation. Under chapter 7, the trustee in bankruptcy may recover from the general partners' individual assets any deficiency of the partnership's assets to meet its liabilities. 11 U.S.C. § 723. Since the partnership's assets appeared to be less than its liabilities, the trustee brought this suit to collect the deficiency from Charles and Gary Lamb. Gary Lamb in effect removed himself from this proceeding by filing a personal bankruptcy case and obtaining a discharge. The question here is whether Charles Lamb was a partner in Rubenstein's with his brother Gary Lamb.

In 1979 Gary had been involved in the retail clothing trade in and around Chattanooga for several years. Charles Lamb lived in Louisville, Kentucky, where he practiced law, specializing in patent and trademark law. Charles Lamb was already involved in two business ventures. He was a partner-owner of an apartment building and owned an interest in a coffee farm in Costa Rica.

Henry Rubenstein owned a retail clothing business in Chattanooga. The business was known as "Rubenstein's for Men and Young Men" or simply "Rubenstein's". He and Gary Lamb were passing acquaintances. Gary became interested in buying the business. He asked his brother, Charles, to become involved. The negotiations for the sale were conducted between Gary Lamb and Henry Rubenstein. Charles Lamb didn't generally participate, but Mr. Rubenstein knew he was involved. At one time, Gary told Mr. Rubenstein that he would have to talk to his brother. Mr. Rubenstein knew that Charles was "going to go in with" Gary, as an owner or partner or at least to help borrow the purchase money. Mr. Rubenstein did not know what agreement Gary and Charles had made as to their interests in the business.

The sale contract was executed in July, 1979. Both Gary and Charles Lamb were named as purchasers. Both executed a promissory note for $85,000 of the purchase price. Both executed a lease of the business premises and a contract to employ Mr. Rubenstein as a consultant.

Mr. Rubenstein and Charles Lamb both thought that Charles suggested the requirement that Mr. Rubenstein work at least 100 hours in any three months in order to keep the job as a consultant.

Charles Lamb contributed $25,000 toward the purchase price. He and Gary both testified that the contribution was a loan to Gary to be repaid whenever he could. Charles Lamb's testimony also indicated that he thought the money gave him an interest in the business's assets.

Charles Lamb said he signed the documents to help Gary acquire the business. Gary had told him that the business didn't generate enough profit for two people. Charles didn't consider himself a partner in the business. He thought of himself more as a surety for Gary. Charles didn't know anything about the clothing business. The parties understood that Gary would operate the business. The sale contract required life insurance only on Gary as security for the $85,000 note. Gary maintained the bank accounts and he was the only person authorized to make withdrawals.

Gary and Charles Lamb and Mr. Rubenstein all testified in effect that Charles did not take part in the day-to-day or routine operation of the business. Charles came by the store when he was in Chattanooga but mostly to visit Gary. On these visits, Charles's business discussions were limited to generalities.

Gary Lamb testified that he considered that he and Charles were operating the business as partners. Charles, of course, testified that he didn't consider them to be partners.

Gary also testified that he and Charles never discussed whether they were partners. Charles never specifically said he was

a partner but also never objected to being held out to be a partner.

About a year after the purchase of the business, Gary Lamb and Henry Rubenstein called Charles Lamb and told him that the business needed some cash. They asked him if he could borrow money in Louisville at a lower interest rate than was available in Chattanooga. He got the money in Louisville at a lower rate.

Roy Gallaher is a certified public accountant who was employed by the law firm that represented Mr. Rubenstein in the sale. After the sale, Mr. Gallaher continued to do the accounting for Rubenstein's. In September, 1979, he wrote a letter to Charles Lamb in response to his suggestion that the business be incorporated. The letter said in part:

> I talked with your brother, Gary, a few days ago and he asked that I write to you concerning the matter of whether you should consider operating the above-named business as a partnership, or change over to a corporation and perhaps elect subchapter S status. As I understand it, your primary concern is income tax.

> \*   \*   \*   \*   \*   \*

> I will be glad to discuss this with you in more detail but my thinking is that you probably should continue to operate as a partnership until such time as you are able to determine from experience just what your profit and loss status is going to be.

Mr. Gallaher set up the books for the business as a partnership, apparently because the purchase agreement and other documents were executed by both Gary and Charles Lamb. He was never told to change the books.

Mr. Gallaher also prepared the tax returns for 1979 and 1980. The returns showed the business as a partnership comprised of Charles and Gary Lamb. On his personal tax returns for those years, Charles Lamb claimed his share of the business's profit for 1979 and loss for 1980. He never amended his personal returns. He did not seek to have the business's returns amended. He said that he didn't have authority to amend the business returns. He didn't claim a loss from the partnership on his personal return for 1981.

Gary Lamb testified that Charles said there were problems with the business's tax returns, but the problems related to the amounts not to filing as a partnership.

Mr. Gallaher continued as accountant for the business until May, 1981, when Jerry Rutherford assumed the accounting duties. He treated the business as a partnership when he set up the books. He filed a partnership tax return for 1981, because the business had been treated as a partnership before. In October or November, 1981, Mr. Rutherford first met with Charles Lamb. They did not discuss whether Charles Lamb was or was not a partner. The partnership's bankruptcy petition was filed in November, 1981. Mr. Rutherford said that Charles Lamb first denied he was partner in 1982. Lamb testified that he told Mr. Rutherford he wasn't a partner, but his testimony wasn't clear as to when he told him.

Gary Lamb filed state business tax reports in 1980 and 1981. The forms did not ask whether the business was a corporation, partnership, or individually owned. The forms did not require the signer to state whether he signed as owner, partner, or corporate officer. Gary Lamb signed the forms without indicating whether he was a partner or the sole owner. Charles Lamb did not sign.

In June, 1981, Gary Lamb filed an application for a new business tax license. He identified himself as the individual owner of Rubenstein's.

In early 1981, Gary Lamb considered buying the building in which Rubenstein's was located. He asked Charles to join in the venture, which was to be separate from Rubenstein's. Charles sent a personal financial statement to the bank. The amounts with respect to Rubenstein's were furnished by Gary. The statement showed Charles as owner of a one-half interest in Rubenstein's and liable for one-half of its

debts. Charles testified in effect that he was a part owner of the business's assets but was not a partner in or an officer of the business.

In early and middle 1981, Gary Lamb borrowed money for the business from American National Bank. Two promissory notes were executed. The first was signed by Gary Lamb as a partner in Rubenstein's. The other note showed the debtor as Gary Lamb doing business as Rubenstein's even though the loan officer, Jerry Crigger, had been told that Charles Lamb was connected with the business. Mr. Crigger testified that he did not prepare the note; a clerk prepared it. Charles Lamb did not sign either note.

The financial reports that were used in acquiring the loan showed Charles Lamb as an equal partner with Gary. Charles denied ever seeing or knowing about these reports. He testified that he had no dealings with banks in Chattanooga. Gary Lamb testified that Charles knew the business had short term loans, such as these, to buy inventory.

Jerry Crigger testified that he obtained the necessary information for the second loan from Gary Lamb and Jerry Rutherford, the accountant. Mr. Crigger testified that he was told about Charles Lamb and saw a financial report showing Charles Lamb as a partner. However, he did not ask for Charles Lamb's signature on the promissory note. He did not notify Charles Lamb of the note. Since this was a business loan, he was not required to make any truth-in-lending disclosure.

Gary Lamb also borrowed money from Commerce Union Bank and executed a promissory note. The note showed Charles Lamb as a partner but was signed only by Gary. The security agreement was signed only by Gary. Commerce Union also received a personal guarantee signed by Gary Lamb and a separate personal guarantee apparently signed by Charles Lamb and Karen Johnson.

Gary Lamb testified that he negotiated the loan from Commerce Union Bank. He further testified that Charles Lamb did not sign the note or the guarantee. Gary didn't know if Charles knew about the note. He also didn't know if Karen Johnson actually signed the guarantee.

Charles Lamb testified that he knew nothing about the note, that he didn't sign the guarantee, and that Karen Johnson didn't sign the guarantee. Charles Lamb said he first learned of the debt when he met with Jerry Rutherford in October or November, 1981, which was three or four months after the loan was made.

In October, 1981, American National Bank sent Charles Lamb a collection letter with regard to the two short term loans that had not been paid when due. Charles Lamb hired a local attorney, David Dycus, to represent him in dealing with the local banks. Mr. Dycus responded to letters from American National Bank and Commerce Union Bank. He testified that he did not advise Charles Lamb with regard to whether he should sign the bankruptcy petition as a partner in Rubenstein's. He did not discuss the partnership question until after the bankruptcy petition was filed and he did not represent Charles Lamb in trying to straighten out the problem.

Bernard Cohen represented Gary Lamb in the filing of the bankruptcy petition. He met with Charles Lamb at the time the petition was filed. He told Charles that he would not file the petition unless Charles signed it. He did not remember any discussions at the time about whether Charles was a partner. The petition was filed quickly in order to get the store reopened after Commerce Union Bank had it closed.

Mr. Cohen testified that his information came from Gary Lamb. He did not represent Charles Lamb. He thought David Dycus did. He didn't remember whether Mr. Dycus agreed with his conclusion that Charles Lamb was a partner.

Charles Lamb testified that he was forced to sign the bankruptcy petition as a partner so that Gary could reopen the store after Commerce Union Bank had it closed. Gary said he had to file in order to reopen the store but Mr. Cohen would not file the petition unless Charles signed as a partner. Charles did not seek to amend the petition

188

because he didn't know it could be amended.

*Discussion*

Tennessee has adopted the Uniform Partnership Act, which defines partnership as "an association of two (2) or more persons to carry on as coowners a business for profit." Tenn.Code Ann. § 61–1–105(a). The Act also sets forth general rules for determining when a partnership exists. Section 61–1–106 provides:

In determining whether a partnership exists, these rules shall apply:

(1) Except as provided by § 61–1–115 persons who are not partners as to each other are not partners as to third persons;

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such coowners do or do not share any profits made by the use of the property;

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived;

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

(A) as a debt by instalments or otherwise;

(B) as wages of an employee or rent to a landlord;

(C) as an annuity to a widow or representative of a deceased partner;

(D) as interest on a loan, though the amount of payment vary with the profits of the business; or

(E) as the consideration for the sale of the goodwill of a business or other property by instalments or otherwise.

■ A person may be a partner though he believes that he isn't. The legal effect of the parties' agreement, not their subjective intent, determines whether they are partners. *Wyatt v. Brown,* 39 Tenn.App. 28, 281 S.W.2d 64 (1955).

A person who isn't a partner will be treated as a partner if he has represented that he is a partner or acquiesced in representations that he is a partner. However, this "partnership by estoppel" only benefits a person who has extended credit to the alleged partnership in reliance on the representations. Tenn.Code Ann. § 61–1–115. The trustee in this case has not argued for a partnership by estoppel.

■ Of course, a person's representations or acquiescence in representations that he is a partner are evidence that he was a partner. *Wyatt v. Brown,* cited above.

■ The facts generally support the conclusion that Charles and Gary Lamb were partners. Charles contributed money toward the purchase of the business and was liable for the financed portion of the purchase price. He and Gary both executed a lease of the business premises and a contract to employ the former owner of the business. Charles Lamb put more money into the business about a year after the purchase. He claimed a share of the profits as income on one income tax return and claimed a share of the losses on another return. He knew that the business filed partnership income tax returns. He knew that the business's books showed him as a partner. He furnished one bank a financial statement showing that he was a partner. The trustee correctly characterized the situation by saying that Charles Lamb wanted the advantages of partnership until the business began to fail and it appeared he might suffer a loss. The facts of this case are similar to *Boxill v. Boxill,* in which the court also found a partnership. 201 Misc. 386, 111 N.Y.S.2d 33 (Sup.Ct.1952).

Only two questions require more detailed consideration.

■ Charles Lamb contended that the $25,000 he contributed to the purchase of the business was a loan to Gary. Gary Lamb agreed that he was to repay the money. It appears, however, that the loan was to be repaid whenever Gary was able to repay it from the business's income. The absence of a definite obligation to repay,

without regard to the business's fortunes, indicates that the person who "lent" the money is really a partner rather than a creditor. *Garrett v. Harrell,* 193 Okl. 662, 146 P.2d 829 (1944); *Dinkelspeel v. Lewis,* 50 Wyo. 380, 62 P.2d 294 (1936) reh. den. 65 P.2d 246 (1937); *Davis v. Gilmore,* 244 S.W.2d 671 (Tex.Civ.App.1951); 59 Am. Jur.2d § 54 (1971).

■ The second question concerns Charles Lamb's failure to take a large part in the management of the business. The public perception of a partnership may be that the partners will contribute equally and will have equal responsibilities in the management of the business, but this is not necessary for the existence of a partnership. *Wymer v. Dedman,* 233 Ark. 854, 350 S.W.2d 169 (1961). Partners may agree that one will be the primary manager of the business. *Dills v. DeLira Corp.,* 145 Cal. App.2d 124, 302 P.2d 397 (1956). Furthermore, partnerships are often created in which a "silent" partner contributes money, credit, or property, and an active partner contributes his labor and openly manages the business. *Watson v. Watson,* 231 Ind. 385, 108 N.E.2d 893 (1953); *Brandon & Dreyer v. Conner,* 117 Ga. 759, 45 S.E. 371 (1903); see also *Garnett v. Harrell,* cited above; *Dinkelspeel v. Lewis,* cited above. The court believes this case fits that pattern. Charles and Gary Lamb were partners even though Charles was not active in the day-to-day operation or management of the business.

Bankruptcy Code § 723(a) provides:

If there is a deficiency of property of the estate to pay in full all claims allowed in a case . . . concerning a partnership, then each general partner . . . is liable to the trustee for the full amount of such deficiency.

The statute deals only with the difference between allowed *unsecured* claims and property of the estate that is available to pay such claims. Property subject to an unavoidable lien is still property of the estate but must first be applied toward payment of the allowed secured claim.

The statute also deals only with *allowed* unsecured claims. This may present problems since claims are automatically allowed if a proof of claim is timely filed and if no objection is filed. 11 U.S.C. § 502(a). At any one time during a case the allowed claims are those for which proofs have been filed but no objections have been filed, even though some may be objected to later. A problem will arise if after the judgment some claims are disallowed, but the problem can be dealt with when it arises.

The trustee testified that the unsecured claims total $184,487 ($180,945 regular unsecured plus $3,542 priority unsecured). He also testified that he has on hand $23,000 to apply to payment of these claims.

The trustee is entitled to judgment in the amount of $184,487 less $23,000, which equals $161,487. The court will enter judgment accordingly.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.