**In re CS ASSOCIATES, d/b/a University Nursing & Rehabilitation Center, Debtor.**

**Mitchell W. MILLER, Trustee, Plaintiff,**

v.

**Eugene SPITZ, M.D. and Raymond Silk, M.D., Defendants.**

**Bankruptcy No. 88–12842S.
Adv. No. 93–0472S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 21, 1993.

Mitchell W. Miller, Miller & Miller, Philadelphia, PA, Trustee.

D. Ethan Jeffrey, Ciardi, Fishbone & DiDonato, Philadelphia, PA, for Trustee.

J. Scott Victor, Saul, Ewing, Remick & Saul, Marc J. Zucker, Mann, Ungar & Spector, P.A., Philadelphia, PA, for defendant—Raymond Silk, M.D.

Robert J. Bush, Media, PA, for defendant—Eugene Spitz, M.D.

Pace Reich, Philadelphia, PA, for debtor.

John J. Francis, Jr., Shanley & Fisher, P.C., Morristown, NJ, William Sweeney, Schubert, Bellwoar, Mallon & Walheim, Philadelphia, PA, for United Jersey Bank.

Joseph DiGuiseppe, Asst. City Solicitor, Law Dept., Enforcement Div., Philadelphia, PA, for City of Philadelphia.

Dr. Nicholas Canuso, pro se.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

### OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before the court for a final resolution is an adversary proceeding commenced by the

Chapter 7 trustee in this case, Mitchell W. Miller ("the Trustee"), pursuant 11 U.S.C. §§ 723(a), (b), seeking a deficiency of over $10 million against Raymond Silk, M.D. ("Silk"), one of three general partners of the Debtor, CS ASSOCIATES ("the Debtor"), a limited partnership which previously operated the University Nursing & Rehabilitation Center. Silk defends on the grounds, *inter alia*, that (1) the Trustee's claim is barred by laches or a two year statute of limitations which he proposes that the court "borrow" from 11 U.S.C. § 546(a)(1); and (2) the Trustee erroneously calculated an excessive deficiency by including, in his calculations, claims for which Silk is not "personally liable," as determined by the terms of certain claims against the Debtor or which arose prior to the expiration of the statute of limitations applicable to the claimants' causes of action against him individually.

Finding relevant caselaw sparse, we conclude, on the basis of a reading of the applicable statutory law, that the Trustee is entitled to a recovery of approximately $1.5 million against Silk. First, we refuse to find the Trustee's action barred by limitations or laches, since we find that any "borrowing" from § 546(a)(1) is inappropriate and that the Trustee did not unreasonably delay in the filing of the instant matter to the unfair prejudice of Silk. Further, we find that the deficiency to be assessed includes (1) those claims which Silk alleges were barred against him personally by the applicable state statute of limitations; and (2) claims contingent on (a) the payment of an agreed judgment by one of Silk's co-partners, and (b) to the City of Philadelphia ("the City") by United Jersey Bank ("UJB") under 11 U.S.C. § 506(c). We also find that Silk is not able to invoke in his defense an intra-partner agreement allegedly limiting his liability to twenty-five (25%) percent of the deficiency. However, we find that the deficiency for which Silk is liable does not include the claim of La Mar–Gate, Inc. ("LMG"), since this debt was incurred prior to Silk's joining the partnership and there is no evidence that he expressly assumed liability for that debt; or the claim of UJB since that claim is limited by its own terms to recourse against the Debtor's realty.

## B. PROCEDURAL AND FACTUAL HISTORY

The bankruptcy case underlying the instant proceeding was filed by the Debtor on August 15, 1988. Attempts of the Debtor to keep its nursing home open in the face of pending state health law violations proved impossible after late 1988. Later efforts to sell its facility and that of an adjacent hospital with related ownership, which was the subject of an earlier bankruptcy case, *In re University Medical Center*, Bankr. No. 88–00003S ("UMC" or "the *UMC Case*"), was frustrated by vandalization of both facilities in November, 1989. This case, as had the *UMC Case* earlier, was converted to Chapter 7 on April 18, 1990, and the Trustee was appointed on April 25, 1990.

The most significant legal matters in the early stages of the Trustee's stewardship were suits instituted by UJB, as an alleged insured party, and by the Trustee himself, to collect on liability insurance covering the facility. The UJB claim resulted in a lengthy Opinion reported at 121 B.R. 942 ("*CS I*"). The administration of the Debtor's estate has also featured a sale of the remains of the Debtor's facility in November, 1992.

The administration process will hopefully end with a continued Final Audit hearing scheduled on November 18, 1993. At the initial Final Audit hearing on October 14, 1993, we directed the Trustee to file, serve, and list for hearing, on November 18, 1993, a proposed Objection to the claim of UJB and any other Objections to claims which he might deem appropriate on or before October 18, 1993. All of the other Objections to claims were litigated earlier in 1993, and the only Objection presently outstanding is an Objection of Silk to UJB's claim, the hearing on which we continued to November 9, 1993; and the Trustee's Objection to the purported secured status of the claims of the Internal Revenue Serivce ("the IRS"), on which briefing is to be completed by October 22, 1993.

Two appeals of our previous decisions arising out of this case have resulted in recent decisions of the district court: (1) a reversal of our reduction, to $150,000, of a requested

$250,000 one-third contingent fee on a $750,000 settlement of the Trustee's lawsuit against the liability insurer of the Debtor's facility, payable to the Trustee's special counsel, Harry P. Begier, Esquire, which is reported at 1993 WL 315656 (E.D.Pa. Aug. 18, 1993) ("*CS II*"); and (2) an affirmance of our decision allowing the City to assert its tax claims against UJB under § 506(c), at 159 B.R. 148 (E.D.Pa.1993), *appeal docketed* (3rd Cir.) ("*CS III*").

The instant § 723 proceeding was filed by the Trustee on June 8, 1993, against Silk and another co-partner of the Debtor, Eugene Spitz, M.D. Collectively Silk and Spitz are referenced herein as "the Partners;" the third, managing partner of the Debtor, Dr. Nicholas Canuso, has averted any actions against him by filing his own personal bankruptcy case in the District of New Jersey.

The Partners both initially responded to the Complaint in this proceeding by filing Motions requesting that this court dismiss the Complaint because the Trustee's claims were barred by the allegedly-applicable two-year statute of limitations set forth at 11 U.S.C. § 546(a)(1). This court, in an Opinion of July 29, 1993, reported at 156 B.R. 755 ("*CS IV*"), denied these Motions, finding that an action brought by a Trustee under § 723 is not subject to § 546(a)(1).

On August 5 and 13, 1993, respectively, the Partners each filed motions requesting reconsideration of *CS IV* and seeking partial summary judgment as to certain claims which they contended had to be excluded from any deficiency claim, *i.e.:* (1) $470,000, consisting of claims which had been amended, duplicated, disallowed or withdrawn; (2) $597,510.26, which was allegedly the sum of claims that were no longer claims against the estate since they were to be paid out of the sale of partnership realty; and (3) $8,221,873.02 for which the Partners asserted that they were not "personally liable" because the state statutes of limitations allegedly applicable thereto had expired. On August 13, 1993, the Partners also both filed Answers to the Complaint, affixing jury demands thereto.

In response to these filings, this court entered an Order on August 17, 1993, stating that, since the instant proceeding was equitable in nature, the Partners had no right to a trial by jury therein. *Accord, In re Bell & Beckwith,* 112 B.R. 863, 867 (Bankr.N.D.Ohio 1990). *But see In re Owensboro Distilling Co.,* 108 B.R. 572, 574 (Bankr.W.D.Ky.1989) (court upholds a jury demand in a § 723 proceeding because it focuses only on the public right/private right dichotomy rather than the more significant equitable/legal claim distinction). We also denied the requests for reconsideration and the attempts to dismiss any aspects of the proceeding pending a trial before this court, scheduled on August 31, 1993.

At the outset of the trial on the latter date, counsel for the Trustee and Spitz advised us that they had agreed to the entry of a judgment against Spitz in the amount of $600,000. Thereafter, the matter went to trial with Silk as the only remaining defendant.

In support of his claims against Silk, the Trustee offered his own testimony and that of D. Ethan Jeffrey, Esquire, an associate in the law firm representing the Trustee in this case. Jeffrey testified that he had reviewed the claims against the Debtor's estate and, following adjustments for withdrawn, disallowed, amended, reduced or settled claims, the Debtor's deficiency remained in the amount of $5,222,211.06. This figure included a claim of UJB which had been reduced from $6,665,000 to $3,360,000, and a reduction in the claim of LMG from $1,000,000 to $200,000.

The Trustee testified that, following his appointment, he attempted to locate records of the accounts receivable owed to the Debtor, but was unsuccessful and had therefore been unable to pursue collection of same. He admitted that, following a meeting of creditors on June 19, 1990, he certified that this case was a "no asset" case. However, at a status hearing on this case scheduled by this court on September 8, 1992, resulting in the fixing of a bar date of November 16, 1992, he reported that he was monitoring an insurance claim of the Debtor. This claim was ultimately settled and approved by this court on December 23, 1992, in the amount of $750,000, the settlement being uncontested

after Silk withdrew his objections thereto. The docket reflects that, after a subsequent status hearing of February 9, 1993, this court, not recalling the fixing of the earlier bar date, established a new bar date of April 1, 1993. In that Order, the Trustee was also directed to file the Final Audit papers in this case with the United States Trustee's office on or before May 3, 1993.

In opposition to Trustee's claim, Silk submitted his own testimony and that of an associate in the law firm representing him in connection with the instant proceeding, Adam Isenberg, Esquire. Silk testified that he acquired his interest in the Debtor in 1983, subsequent to its formation on February 7, 1982. As part of his agreement to join the partnership, Silk testified that he agreed to assume any partners' liabilities associated with the UJB loan, but not the loan from LMG, an entity controlled by Canuso. Silk further stated that he had assumed the UJB loan only because it was "non-recourse," and he would therefore not be personally liable for it. Silk also testified that he had assisted in the sale and maintenance of the Debtor's nursing home and that he had worked with Begier in identifying the losses which served as the basis for the Trustee's $750,000 settlement with the insurer. He claimed that the Trustee had not sought his assistance in recovering the Debtor's accounts receivable or he would have provided same, as he claimed to have done in the UMC Case.

Silk expressed dismay that the Trustee had never advised him that he (the Trustee) intended to pursue a deficiency claim against him. Silk claimed that, because he assumed that his liabilities in connection with the Debtor were limited to his personal undertakings, he had begun negotiations with certain creditors to which he was personally liable, notably the IRS. Silk stated that, if he had known about the Trustee's intention to bring this proceeding against him, he would not have withdrawn his objection to the settlement of the Trustee with the liability insurer, which he now claimed was inadequate, and that he may have attempted to avoid legal costs by filing his own personal bankruptcy at an earlier stage.

Isenberg, in support of the argument that Silk owed no deficiency to the estate, testified that he had, like Jeffrey, reviewed the claims filed against the Debtor. Based upon his calculations, which also included deduction of claims which had been withdrawn, disallowed, amended, reduced or settled, Isenberg concluded that the Debtor did not have a deficiency. Unlike the Trustee's calculation, however, Isenberg's calculation of the deficiency did not include any creditors' claims which he deemed to have been contract claims, because of Silk's contention that these claims were barred by a four year statute of limitations as to causes of action in contract against Silk personally, nor did he include any portion of the UJB and LMG claims.

Documents admitted into the record include the Limited Partnership Agreement of CS Associates, dated February 7, 1982 ("the Partnership Agreement"). It was also established, by documentary evidence, that, on March 10, 1983, prior to Silk's replacement of Abraham L. Cohen, M.D., as a partner of the Debtor, the Debtor had entered into an Installment Sale Agreement dated February 16, 1983, with the Philadelphia Authority for Industrial Development ("PAID") in the amount of $6,870,000 for the acquisition, construction, and completion of the Debtor's nursing home ("the Sale Agreement").

Effective February 16, 1983, PAID assigned its rights in the Sale Agreement to UJB under a Trust Indenture ("the Trust"). The Trust assigned a first mortgage on the Debtor's nursing home to UJB. It also required that UJB assure the repayment of $7,000,000 in bonds issued by PAID to finance the construction of the nursing home. Paragraph 5.01 of the Sale Agreement provided that the obligation between Debtor and PAID was "non-recourse" and that liability for repayment of the monies involved was "limited to the Mortgaged Premises and that property pledged as security for repayment or satisfaction of such obligations."

On May 18, 1983, the Debtor obtained a loan in the amount of $1,000,000 from LMG, an entity wholly owned by Canuso. The note securing this loan was signed by Canuso,

Spitz, and Cohen. In addition, the note was personally guaranteed by Spitz.

Silk was admitted to the partnership as an equal general partner and limited partner effective April 4, 1983. The document memorializing the terms under which Silk became a partner of the Debtor, entitled a Transfer of Partnership Interests Agreement ("the Transfer"), provided that he would be liable under the Partnership Agreement and the Sale Agreement under the terms and conditions provided therein. Among the terms of the Partnership Agreement are provisions which state (1) "[a]ll profits and losses of the partnership" are to be allocated pursuant to each partner's percentage of ownership interest in the partnership; (2) "the General Partners shall have no obligation to provide the Partnership with funds by way of loan, capital contributions or otherwise, . . .;" and (3) "the liability of each Limited Partner shall be limited to the value of their actual capital contribution except as provided by law."

The parties appear to agree that the Trustee has funds of $690,869.38 on hand and that sixty-eight (68) creditors have filed claims totalling $10,158,347.00 in this case. They do not appear to disagree that claims totalling $107,193.00 have been disallowed; claims totalling $141,819.44 have been withdrawn; claims totalling $75,647.00 are duplicates of previously filed claims; claims have been reduced by a total amount of $885,-475.91 during the administration of this case, including an $800,000 reduction of LMG's claim; and claims have been amended to reflect a reduction of their total by $187,-155.20.

However, not included in this calculation are the following: (1) $190,000 owed to Begier as a result of the decision in *CS II* which was unpaid at the time of trial; (2) a commission of $25,952.28 sought by the Trustee, reduced by this court to $23,375 in an Order of October 14, 1993; and (3) an estimated additional amount of attorney fees payable to the Trustee's counsel of $57,000.

Remaining in litigation, as noted, are Objections to the status, but not the amount, of secured claims totalling over $540,000 filed by the IRS; and the Objection of Silk to UJB's claim.

At the close of trial the court entered an Order of September 1, 1993, consistent with the parties' agreement, allowing Silk to file Proposed Findings of Fact and Proposed Conclusions of Law and/or a Brief in support of his position, on or before September 22, 1993, and the Trustee to respond in kind on or before October 6, 1993. Both parties filed timely findings in support of their respective positions. On October 8, 1993, Silk requested an opportunity to make a supplemental submission. Although not given permission to do so, Silk's counsel nevertheless proceeded to engage in the highly disfavored practice of submitting an unsolicited supplemental submission. *See In re Jungkurth,* 74 B.R. 323, 325–26 (Bankr.E.D.Pa.1987), *aff'd sub nom. Jungkurth v. Eastern Financial Services, Inc.,* 87 B.R. 333 (E.D.Pa.1988). Any future similar conduct will be met with monetary sanctions.

## C. CONCLUSIONS OF LAW/DISCUSSION

1. *THIS PROCEEDING IS NOT BARRED BY THE TRUSTEE'S LACHES OR A STATUTE OF LIMITATIONS "BORROWED" FROM 11 U.S.C. 546(a)(1).*

■ Silk makes two arguments, reminiscent of his motion to dismiss which we disposed of in *CS IV,* by which he attempts to avoid any and all liability for a deficiency due to the Trustee's alleged delay in instituting this action. First, he contends that dismissal of the instant matter is mandated by application of the equitable doctrine of laches.

As stated by this court in *In re After Six, Inc.,* 1993 WL 264890 (Bankr.E.D.Pa. July 7, 1993), slip op. at *5,

[i]t is well established that the elements of laches are " '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.' " *EEOC v. Great Atlantic & Pacific Tea Co.,* 735 F.2d 69, 80 (3d Cir. 1984) (quoting *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). . . . *Waddell v. Small*

*Tube Products, Inc.*, 799 F.2d 69, 74 (3rd Cir.1986). *See also, e.g., Minnesota Mining & Mfg. Co. v. Berwick Industries, Inc.*, 532 F.2d 330, 334 (3rd Cir.1976).

■ Thus, laches involves more than mere delay or lapse of time in asserting a claim. Rather, for laches to bar a claim, the delay in prosecuting the claim must be for a length of time which is unexplained, unexcused, and is thus altogether unreasonable under the circumstances, and has been so prejudicial to the party asserting laches that the delay in itself renders it doubtful that the truth can be ascertained and justice rendered. *See Waddell, supra*, 799 F.2d at 74.

In the instant matter, we conclude that the elements necessary to successfully invoke laches are not present. While the Trustee has admittedly delayed to some degree in asserting his claims against Silk, having filed it after even his Final Audit papers were due to be submitted to the United States Trustee, there is no evidence that the delay was unreasonable under the circumstances. Furthermore, although the Trustee did not commence this action until three years after his appointment, during that three-year time period, the Trustee was not able to ascertain the Debtor's exact assets and liabilities, nor could he even reasonably estimate same. In particular, the Trustee was unsuccessful in his efforts to sell the Debtor's realty until late 1992. *CS I*, one of two pieces of litigation regarding insurance coverage on the damaged realty of the Debtor, was pending throughout 1991 and 1992.

In support of the element of prejudice, Silk asserts that the Trustee's failure to bring a deficiency claim earlier caused him to (1) forego filing a personal bankruptcy; (2) expend a "tremendous amount of attorney fees to defend actions brought against him," on the assumption that no additional litigation would be filed against him; and (3) withdraw his objection to settlement of the Debtor's claim for vandalism against its insurer. We find that these allegations do not establish any significant prejudice or damage to Silk.

First, there is no evidence that Trustee's action or inaction precluded Silk from filing bankruptcy. We note that, even now that the Trustee has clearly indicated his intention to pursue him, Silk has not resorted to bankruptcy. It may well be that his asset position would have and would still render recourse to bankruptcy inappropriate.

Second, it has not been established what sums have in fact been expended by Silk to defend actions brought against him, nor that such costs resulted from any action or inaction on the part of the Trustee. It appears that very few creditors of the Debtor actually brought actions against the Partners individually, as Silk notes in unsuccessfully arguing that claims not asserted against him are barred by limitations. *See* page 908 *infra*. It is not clear how the Trustee's alleged delay could have caused or even encouraged such proceedings.

Third, in connection with the Trustee's insurance settlement, the deposition submitted by Silk indicates that his decision not to continue to oppose the Trustee's request to settle with the insurer was based upon information provided to him by Begier, who considered Silk "his client." Moreover, the Trustee need only have established that the settlement rose above "'the lowest point in the range of reasonableness,'" *In re Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D.Pa.1992), *aff'd*, 8 F.3d 812 (3rd Cir. 1993); and *In re Lease–A–Fleet, Inc.*, 1993 WL 102041, slip op. at *7 (Bankr.E.D.Pa. March 19, 1993), for it to have been approved by this court, even over Silk's objections. It is rather apparent that this settlement was for a substantial sum, and it was supported by all other interested parties. Therefore, it would have been likely to have been found to satisfy the criteria for approval by this court irrespective of Silk's lack of support for it.

It is therefore clear that the Trustee is not chargeable with unreasonable delay in instituting this proceeding to Silk's prejudice, and that this action cannot be barred by the Trustee's laches. *Compare After Six, supra*, slip op. at *5–*6 (defendant delayed litigation of the matter at issue on its merits by a series of maneuvers in various courts for over eleven years, making it difficult for the debtor, which was presently in the throes of being liquidated and discharging most of its employees, to assemble its witnesses).

■ Silk also makes an argument, which he assures us is different from that which we rejected in *CS IV*, that, although the two-year statute of repose appearing in 11 U.S.C. § 546(a)(1) may not strictly apply to a § 723 action, we should "borrow" the two-year time-period set forth in § 546(a)(1) in determining what limitation period should be applied to a § 723 proceeding. In support of this theory, he cites *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, — U.S. —, — – —, 111 S.Ct. 2773, 2778–82, 115 L.Ed.2d 321 (1991); and *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 158–72, 103 S.Ct. 2281, 2287–95, 76 L.Ed.2d 476 (1983).

However, as we noted in *CS IV*, 156 B.R. at 758, the policy behind the limitation period set forth in § 546(a)(1)—that a trustee must be encouraged to promptly sort out what are usually pre-petition causes of action—is not applicable to a § 723 action, which does not accrue until after the trustee determines and assesses the assets of, and the claims against, a debtor's estate. Our conclusion that the policies behind the limitations period in the actions specifically referenced in § 546(a)(1) were distinct from those in issue here was one of the principal reasons that we rejected the Partners' argument that § 546(a)(1) should apply to a § 723 action in *CS IV*. *See also Occidental Life Ins. Co. v. Equal Employment Opportunity Comm'n*, 432 U.S. 355, 367–72, 97 S.Ct. 2447, 2454–57, 53 L.Ed.2d 402 (1977) (statute of limitations should not be "borrowed" if the policy underlying the federal cause of action in question differs from that of the statute of limitations that is "borrowed"). We are therefore no more inclined to "borrow" the time limit set forth in § 546(a)(1) to bar this proceeding than we were to apply § 546(a)(1) directly to do so.

■ Furthermore, as we also pointed out in *CS IV*, 156 B.R. at 759 n. 4, even if we did apply the two-year limitations period set forth in § 546(a)(1), that period would not begin to run until the Trustee's cause of action accrued by reason of the fact that the Trustee knew or could have reasonably discovered the existence of a cause of action under § 723 against the Partners. We do not see how the Trustee could have reasonably assessed the propriety of instituting this action until the sale of the Debtor's realty and the parameters of the resolution of the action against the insurer could be assessed, which did not occur until November and December, respectively, of 1992. Arguably, the Trustee had to wait until the expiration of the bar date of April 1, 1993, which the court mistakenly reset to determine the extent of the pertinent claims against the Debtor. The Trustee's commencement of this proceeding in June, 1993, appears clearly within the limitations period which would exist even if § 546(a)(1) were applied to this action.

Therefore, we conclude, as we did in *CS IV*, that this action is not in any respect time-barred.

2. *SILK IS NOT LIABLE FOR ANY PARTNERSHIP DEBT FOR WHICH HE IS NOT "PERSONALLY LIABLE," WHICH, IN THIS CONTEXT, PRECLUDES LIABILITY ONLY AS TO DEBTS FOR WHICH PARTNERS ARE NOT CLEARLY LIABLE TO THIRD PARTIES UNDER STATE LAW.*

Silk argues that the Trustee's claim for a deficiency must be limited to those claims for which he is "personally liable." In support of his position Silk recites Section 723(a), which provides as follows:

**§ 723. Rights of partnership trustee against general partners**

(a) If there is a deficiency of property of the estate to pay in full all claims which are allowed in a case under this chapter concerning a partnership and with respect to which a general partner of the partnership is *personally liable*, the trustee shall have a claim against such general partner for the full amount of the deficiency (emphasis added).

■ However, the Bankruptcy Code does not contain a definition of the term "personally liable," either generally or in this particular context. This term was added to § 723 by § 476(a) of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, 381 ("BAFJA").

The BAFJA amendment "would seem to imply that a general partner is not, or at least might not be, personally liable for partnership debts. As the legislative history makes clear, however, the intention of the amendment is only to preclude the trustee from seeking recourse against a partner with respect to nonrecourse claims." J. Kozyak, C. Throckmorton & P. Russin, *Partnership Bankruptcy: Liability of Partners and Related Issues,* Real Estate Law and Practice Course Handbook Series (October–December, 1990). Further, it appears that the amendment was added to insure that a partner's liability under § 723 would be the same as under state law, and that no additional obligations would be added as a result of bankruptcy law. *Id.* On the other hand, it seems clear that the amendment was not intended to preclude a partner's liability under § 723(a) as to any obligation to creditors of the partnership that the partner would have under state law. Consequently, we must look to state law to determine the parameters of Silk's "personal liability" to the Debtor's estate.

The Debtor, as a Pennsylvania limited partnership, is subject to the laws of Pennsylvania regulating and defining the rights and obligations of partners in a limited partnership. The relevant statutes are the Pennsylvania Uniform Partnership Act, 15 Pa.C.S. §§ 8301 *et seq.,* and the Pennsylvania Revised Uniform Limited Partnership Act, 15 Pa.C.S. §§ 8501 *et seq.* The most relevant portions of these laws are 15 Pa.C.S. §§ 8533(b) (liability of general partner), 8327 (liability of partner), and 8329 (liability of incoming partner), which provide as follows:

**Limited Partnership**

**§ 8533. General powers and liabilities of general partners**

(b) **Liabilities of a general partner.—** Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners. Except as otherwise provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to the partnership and to the other partners.

**General Partnership**

**§ 8327. Nature of liability of partner**

All partners are liable:

(1) Jointly and severally for everything chargeable to the partnership under sections 8325 (relating to wrongful act of partner) and 8326 (relating to breach of trust by partner).

(2) Jointly for all other debts and obligations of the partnership but any partner may enter into a separate obligation to perform a partnership contract.

**§ 8329. Liability of incoming partner**

A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when the obligations were incurred except that this liability shall be satisfied only out of partnership property.

A review of Pennsylvania case law reveals no cases that address the issue of when a partner is "personally liable" to the partnership's estate. However, since Pennsylvania has adopted the Uniform Partnership Act ("the UPA"), we are inclined to look to the decisions of courts of other states which have adopted the UPA for guidance.

However, the only case which appears to provide an interpretation of the phrase "personally liable" under the UPA is a decision by a sister bankruptcy court in a similar bankruptcy contest, *In re Miramar Mall Limited Partnership,* 152 B.R. 631 (Bankr. S.D.Cal.1993). In *Miramar,* a Chapter 7 trustee brought an action to recover an estate's deficiency against a general partner of a limited partnership. The general partner opposed a finding of liability on the ground that the debts at issue were incurred prior to his entry into the partnership, which had occurred only shortly before the bankruptcy filing. The *Miramar* court found that, since the Bankruptcy Code did not contain a definition of "personally liable" and there was no body of federal law on partnerships, it must look to the definition provided by the applicable state law. Citing a California law which is the UPA analogue of 15 Pa.C.S. § 8329,

the court held that the partner was not liable for any deficiency resulting from partnership debts incurred prior to his joining the partnership.

■ Application of that decision to the claims at issue would result in the conclusion that Silk is not liable for the LMG loan, since it was incurred prior to his admission to the partnership and he did not expressly assume the liability for same. We therefore reach that same conclusion. With respect to the UJB loan, however, Silk does not benefit from the provisions of § 8329, since he expressly assumed liability for that debt in the Transfer. However, despite his assumption of the UJB loan obligation, we conclude that Silk nevertheless remains free from liability for the UJB loan, since, under the express terms of the Sale Agreement between Debtor and PAID, the loan is non-recourse and the lender's recovery is limited to the Debtor's real property.

■ However, Silk's argument that the Pennsylvania statute of limitations governing contracts bars all such claims because the underlying debts were incurred more than four years prior to the date of the filing of this suit and the creditors holding such claims failed to commence individual actions against him, is misplaced. First, no case on either the state or federal level which sets forth such a holding was cited by Silk, nor have any been located by this court. Second, the adoption of such a finding would appear to circumvent the bankruptcy purpose of equal and orderly distribution of a debtor's estate. Creditors of a partnership are entitled to rely upon the clear state-law principle that partners are generally ultimately responsible for any deficiency of their partnership. If creditors of the partnership were required to sue the individual partners to make a recovery of a partnership deficiency from the partners, then the first creditors to the courthouse would be compensated. This would cause a "race to the courthouse" and the dismantling of a partner's individual assets. The Code contemplates, at § 723(b), that a partner may be enjoined from disposing of personal assets and may be required to post indemnity (which relief the Trustee sought but was denied on July 8, 1993) during the pendency of a § 723 action. This provision serves the same end of encouraging creditors to pursue claims against partners of a Chapter 7 partnership in an orderly fashion.

Third, making a requirement that a creditor of a partnership file an action against the individual partner would serve no practical purpose, since a creditor is limited in his recovery to the amount of his claim. The Code, at 11 U.S.C. § 508(b), equalizes the treatment of partnership creditors by reducing any claims which partnership creditors have by the amounts that the creditors have already recovered from an individual partner.

Fourth, as the Trustee points out, such a limitation would be impractical. A trustee could conceivably not be appointed until after a partnership case lingered in Chapter 11 for several years. Yet, under Silk's reasoning, in this scenario the Trustee's potential claim under § 723 would be barred before his appointment began.

Furthermore, the assets and liabilities of the estate of a partnership debtor, and hence the potential deficiency, as in the case of the instant Debtor, would normally be difficult for a trustee to assess until a sale of assets occurs (or, as is also a factor in the instant case, an insurance recovery is made), which may occur years after his appointment. Per Silk's argument, the fortuitousness of these circumstances would bar the Trustee's claims against the partners.

The fundamental flaw in Silk's reasoning on this point is his confusion of the causes of action arising from the partnership relationship with individual causes of action by creditors against partners. The two are not the same, and § 723 references only claims arising from the partnership relationship. Claims against partners arising from the partnership relationship cannot legally or logically be subject to the restrictions on claims against partners individually.

■ Similar lack of authority and flaws in reasoning undermines Silk's belated alternative contention that his liability for any partnership deficiency is limited to his twenty-five (25%) percent share of the Debtor's profits and losses.

■ Silk claims that this issue is governed by the provisions set forth in 15 Pa.C.S. § 8343, which provides as follows:

### § 8543. Sharing of profits and losses.

The profits and losses of a limited partnership shall be allocated among the partners, and among classes of partners, in the manner provided in writing in the partnership agreement. If the partnership agreement does not so provide in writing, profits and losses shall be allocated on the basis of the value (as stated or determined in the manner provided in the partnership agreement, if stated or provide for therein) of the contributions made by each partner to the extent they have been received by the partnership and have not been returned, and otherwise per capita.

Silk's contention that § 8543 is applicable to the instant matter is incorrect. First, a search of Pennsylvania case law and that of other states adopting § 503 of the UPA, after which § 8543 was patterned, did not reveal any authority supporting the notion that this section was intended to govern the liability of a general partner of the limited partnership *to third parties*. Rather, a review of the Committee Comments to § 8543 indicate that its purpose is to "clarif[y] an ambiguity under the prior law which did not provide for the basis on which partners would share profits and losses in the absence of an agreement." Since a limited partnership is or at least was basically a vehicle for limiting tax liability, this provision appears to address the allocation of profits and losses in connection with tax issues.

Second, the position advocated by Silk is directly contrary to the language of 11 U.S.C. § 723(a), which provides that "the trustee shall have a claim against such general partner for the *full amount* of the deficiency" (emphasis added). The legislative history of § 723, H.REP. No. 95–989, 95th Cong., 2nd Sess. 95 (1978), U.S.Code Cong. & Admin.News pp. 5787, 5881, further supports a literal reading of the statute and a review of same, indicating that

[s]ubsection (a) specifies that each general partner in a partnership debtor is liable to the partnership trustee for any deficiency of partnership to pay *in full* all administra-

tive expenses and *all claims* against the partnership (emphasis added).

*See also* H.REP. No. 95–595, 95th Cong., 2nd Sess. 199 (1977) U.S.Code Cong. & Admin.News pp. 5787, 5963, 6160 ("The deficiency in partnership property is recoverable *in full* from each general partner in the partnership in accordance with 11 U.S.C. § 723(a)") (emphasis added).

Third, the relevant portions of the Partnership Agreement, quoted at page 904 *supra*, assuming *arguendo* that its provisions could in any event be deemed enforceable against creditors who were not parties to it, do not themselves support Silk's contention that liability of the partners for any deficiency is limited by the terms of the Partnership Agreement. These provisions merely address, like § 8543, the allocation of profits, losses, and liabilities of the partners *inter se*. They do not purport to address the issue relevant here, *i.e.*, the partners' relative liabilities to third party creditors of the partnership for any deficiencies. And, if they did, they would clearly appear to be enforceable only among the partners themselves.

Therefore, except for the LMG and UJB claims, Silk is fully liable for all of the claims which have been or will be successfully asserted against the Debtor.

### 3. THE DEFICIENCY CALCULATION MUST DISREGARD PAYMENT CONTINGENCIES WHICH MAY ARISE SUBSEQUENTLY, AS THE ESTATE HAS BEEN ALMOST COMPLETELY ADMINISTERED.

In contrast to his argument that the Trustee delayed unreasonably in waiting to bring this action until the collection of assets and determination of liabilities was nearly completed, and the parameters of liability under § 723 were apparent, Silk argues that a number of claims regarding which liabilities or payment from other sources are uncertain and therefore should be deducted from the deficiency to be assessed against him. However, we believe that the process of administration of this estate is now quite mature, and the appropriate approach, at this stage, is to calculate a deficiency on the present

state of the record and enter a judgment in this amount, with the caveat that certain contingencies may occur which should result in credits to Silk against that judgment. With these principles in mind, we approach several contentions of Silk that certain deductions should be made from the deficiency calculation.

First, Silk contends that the deficiency was miscalculated by the Trustee because his calculations included claims to which the Trustee has filed objections. Relying on the language of § 723(a) which refers to "allowed claims," Silk posits that, since an objection to a claim removes it from the "allowed claim" category, the presence of an objection to a claim requires that this court exclude such claims from a deficiency determination. Silk's argument is not supported by precedent and we believe that it is incorrect.

In *Bell & Beckwith, supra,* 112 B.R. at 869, the court addressed the issue of whether the allowance of a claim must be determined prior to a determination that a § 723 deficiency exists. The *Bell & Beckwith* court, citing *In re Lamb,* 36 B.R. 184, 189 (Bankr. E.D.Tenn.1983), stated that "[t]he position that all allowed claims must be judicially determined prior to the Court issuing any judgment against the partners must be rejected." 112 B.R. at 869. The court, quoting *Lamb,* 36 B.R. at 189, and finding that " '[a] problem will arise if after the judgment some claims are disallowed, but the problem can be dealt with when it arises,' " held that the Trustee was allowed to prove the minimum deficiency and make adjustments as they occurred. *Id.*

The rationale in *Bell & Beckwith* is applicable to Silk's contention that the fact that the Trustee's objection to the proof of claim filed by the IRS is outstanding should bar any inclusion of that claim in the deficiency calculation. We note that the Objection to the IRS' claim is presently the only objection to any claim which remains outstanding except for Silk's own objection to the UJB claim, which probably will become academic in light of our decision to exclude the entire UJB claim from the deficiency claim against Silk. We also note that the Trustee is only

disputing the secured status of the IRS' claim and not the amount of this claim, and that the issue of the claim's status therefore appears to be irrelevant to the calculation of the Trustee's deficiency claim against Silk in any event. Therefore, the IRS claim must be included in the deficiency calculation.

The same rationale of *Bell & Beckwith, supra,* is also applicable to Silk's objection to the inclusion of the claims of the City in the calculation of his deficiency. These claims have been allowed against the Debtor by our Order of September 25, 1993, even though this court, and the district court in *CS III,* have also ruled that the City may assert the same claims against UJB's security interest in the Debtor's facility under 11 U.S.C. § 506(c), an issue which UJB has now appealed to the Third Circuit Court of Appeals. Despite the pendency of these disputes and the possibility that the City will satisfy its claims from UJB's assets, since they are also claims allowed against the estate, the City's remaining claims against the estate must be included in a deficiency calculation. To the extent that the City recovers on its claim against UJB, the deficiency can merely be adjusted, or, if paid, the Trustee and/or Silk could argue that they can be subrogated to the City's rights against UJB under 11 U.S.C. § 509(a).

Finally, there is no basis to exclude the $600,000 amount of the Trustee's agreed judgment against Spitz from the calculation of Silk's deficiency unless and until Spitz makes payment. The liability of Silk and Spitz for a deficiency is clearly joint and several, as co-partners of the Debtor.

The parties appear to agree that the appropriate method of calculation of the deficiency is to begin with the total of all of the claims filed against the estate and to deduct therefrom all of the claims eliminated or reduced and all of the claims for which it is determined that Silk is not liable.

The parties differed on the total of the claims which should be utilized in their methods of calculation. The Trustee included the amounts of claims one through sixty-six (66) for a total of $10,143,651.00, while Silk based his initial figure upon all of the sixty-eight

(68) claims, totalling $10,158,347.93. We will begin from the total of all sixty-eight (68) filed claims, since we believe that this methodology would more accurately reflect and account for all of the claims against the Debtor.

Second, this court will deduct from the total of the filed claims the amounts referenced at pages 903–904 *supra* for (1) disallowed claims ($107,193.00); (2) withdrawn claims ($141,819.44); (3) duplicate claims ($75,647.00); (4) reduced claims ($885,475.91); (5) amended claims ($187,155.20); (6) the remaining LMG loan balance ($200,000); and the UJB claim ($6,665,000.00). These deductions yield in what we will designate as the adjusted total of the claims against the estate.

Third, upon determining the adjusted total of the claims against the estate, this court must deduct therefrom the agreed amount of the funds which the Trustee has available for distribution to creditors ($690,869.38).

Fourth, this court is obliged to add the outstanding unpaid administrative claims against the estate. We have determined that the sum owed to Begier ($190,000), the Trustee's allowed commission ($23,375), and the estimate remaining unpaid fees to the Debtor's counsel ($57,000), must all be added back into the deficiency sum. As a result of all of the foregoing, we derive a deficiency of $1,475,563.00. The mathematics involved in the court's calculations, as described *supra*, are as follows:

| | |
|---|---:|
| Total Claims | $10,158,347.93 |
| Adjustments | |
|   Disallowed Claims | 107,193.00 |
|   Withdrawn Claims | 141,819.44 |
|   Duplicate Claims | 75,647.00 |
|   Reduced Claims | 885,475.91 |
|   Amended Claims | 187,155.20 |
|   Remaining LMG Claim | 200,000.00 |
|   UJB Claim | 6,665,000.00 |
|   Subtotal of Adjustment | ($8,262,290.55) |
| Adjusted Total of Claims | $1,896,057.38 |
| Trustee's Funds on Hand | (690,869.38) |
| Deficiency before inclusion of Additional Administrative Claims | $1,205,188.00 |
| Additional Administrative Claims | |
|   Trustee Commission | 23,375.00 |
|   Attorney's Estimated Fees | 57,000.00 |
|   Begier's Fees | 190,000.00 |
|   Subtotal of Additional Administrative Claims | $ 270,375.00 |
| Deficiency | $1,475,563.00 |

## D. CONCLUSION

An Order reflecting a judgment in the amount of $1,475,563.00 will therefore be entered in favor of the Trustee and against Silk.